## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| BINTI MOHAMED and her minor | ) | |
| children, A.O.A., K.H.K., | ) | |
| F.H.K., M.H.K., S.H.K., and S.H.K., | ) | |
| | ) | |
| Plaintiffs | ) | Civil Action No. 2:17-cv-73-cr |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL MCLAURIN, | ) | |
| | | |
| Defendant | | |

### Plaintiffs' Trial Memorandum

Plaintiffs here sue defendant for violation of their civil rights under Title VIII of the Civil Rights Act, 42 U.S.C. §3601 et seq., also referred to as the "Fair Housing Act." Plaintiffs assert that defendant discriminated against them in housing because of Ms. Mohamed's sex and the plaintiffs' national origin by interfering with the exercise of their civil rights under 42 U.S.C. §§ 3617 to live in housing. Plaintiffs seek $200,000 in compensatory and punitive damages, costs, and attorneys' fees and an order requiring that defendant attend housing discrimination training. Defendant denies that he discriminated against plaintiffs.

In a Title VIII case alleging hostile housing environment in violation of section 3617, the Eastern District of New York stated:

> The peaceful enjoyment of one's home is a root concept of our society. It is obviously sufficiently pervasive to embrace the expectation that one should be able to live in racial and ethnic harmony with one's neighbors. This case is not about providing a federal judicial forum for the resolution of disputes amongst neighbors. See *Weisz*, 914 F.Supp. 1054–55. It is simply about holding one accountable for intentionally intruding upon the quietude of another's home because of that person's race, color, religion, sex, familial status or national

origin. *Ohana v. 180 Prospect Place Realty Corp.*, 996 F.Supp. 238, 243 (E.D.N.Y. 1998)

**Background Law: Right to Exclude and Landlord's Right of Access**

Since plaintiffs here allege unreasonable access to their home by defendant, we briefly discuss residential landlord-tenant law. The Supreme Court has held that the right of exclusion is "[o]ne of the main rights attaching to property." *Byrd v. United States*, —— U.S. ——, 138 S.Ct. 1518, 1527, 200 L.Ed.2d 805 (2018) (citing 2 W. Blackstone, Commentaries on the Laws of England, ch. 1). Residential tenancies, however, are governed by property, contract, and statutory law. 49 Am. Jur. 2d Landlord and Tenant §§ 1-2.

Vermont's Residential Agreement Act, 9 V.S.A. §4451 et seq. which curtails residential tenants' property right to exclusive possession to allow a landlord access in certain circumstances for particular reasons to ensure their property is secure and to comply with their duty to provide habitable homes. In Vermont, the relative rights of residential tenants and landlords regarding access to the leased premises are set out at 9 V.S.A. §4460. Under Vermont law, a residential landlord must obtain consent to enter a leased home, and that consent must not be unreasonably withheld. A landlord may also gain access upon forty-eight hours written notice for specified reasons and without consent or notice only "when the landlord has a reasonable belief that there is imminent danger to any person or to property." Counsel knows of no reported decisions interpreting Section 4460.

I.    **Facts and Testimony**

A) **Uncontested Facts**

Defendant Michael McLaurin owns the subject property located at 72-78 Front Street. Answer, paragraph 11.[1] Defendant rented to plaintiff Binti Mohamed apartment 74 in the 72-78 Front Street building ("the apartment" or "Front Street"). Exhibit C: Lease. Plaintiffs moved into the Front Street apartment on or about March 1, 2016. Answer, paragraph 11. Defendant terminated plaintiff's tenancy in the spring of 2017 for no cause. Answer, paragraph 18. Plaintiffs continued to live in the apartment after defendant terminated Ms. Mohamed's tenancy. Plaintiffs moved out of 74 Front Street in about February, 2018.[2] During the time the plaintiffs lived at 74 Front Street, there was a water leak in the apartment below them. Mr. McLaurin knew that Ms. Mohamed can understand and speak some English.[3] Mr. McLaurin entered plaintiffs' home at least 30 times without notice.[4]

### B)  Plaintiffs National Origin and Religion, and Ms. Mohamed's Sex

 Ms. Mohamed is a woman.[5] Plaintiffs are Muslim.[6] Plaintiff Binti Mohamed was born in Somalia, raised in Kenya, and emigrated from Kenya to the United States as a young woman.[7] All of the plaintiffs here other than Ms. Mohamed are Ms. Mohamed's children.[8] Plaintiffs are therefore all of Somali birth or lineage or ancestry. Finally, plaintiffs move the Court to take judicial notice of the fact that Somalia is in Africa pursuant to F.R.E. 201. Plaintiffs submit that all of the plaintiffs here are of Somali or African lineage.

---

[1] Trial testimony, Volume 3, page 63, lines 5-15.
[2] Trial transcript: Volume 2, page 40, lines 14-17: Testimony of Mr. Kowa; Trial transcript: Volume 2, page 71, lines 6-7: Testimony of Binti Mohamed.
[3] Volume 3, page184, lines 2-3.
[4] Trial transcript: Volume 3, page 79, lines 19-25.
[5] Trial transcript, Volume 2, page 6, line 19-25.
[6] Trial transcript, Volume 2, page 67, line 5 – page 68, line 19.
[7] Trial transcript Binti Mohamed's testimony: Volume 2, p 63, Lines 2, 14-19.
[8] Trial transcript, Binti Mohamed testimony: Volume 2, p 64 Line 3- p 67 Line 4.

### C) Contested Facts

**Defendant Entered Plaintiffs' Home Frequently without Notice, without Calling, and without Even Knocking and Harassed Plaintiffs Because of Their National Origin and Sex While There**

Mr. McLaurin made derogatory comments about Africa and told Ms. Mohamed they should go back there.[9]

> He told me, "Someone like you will be better taking that to your country. They don't have the water. They don't have the food. They don't have the medical system. Somebody like you is good to go back to your country."

Ms. Mohamed testified that Mr. McLaurin woke her and her children up one morning, standing in her bedroom doorway, yelling at them.[10] Ms. Mohamed testified that Mr. McLaurin came into the apartment without notice took down the curtain while she was showering and saw her completely naked.[11]

> Mr. McLaurin come in, came into the bathroom, and he took off the curtain, and he looked at me. I was naked. And I told him, "I'm naked. I am taking bath. Please get out of here." And he told me, "This is my apartment. I own the building."

Ms. Mohamed testified that she felt bad and that she cried.[12]

Defendant's counsel cross-examined Ms. Mohamed regarding her testimony about the shower, using the transcript of his deposition of her.[13] Ms. Mohamed maintained she had said the same thing during her deposition and that it must have been written down wrong. This was not the only testimony that illustrated the

---

[9] Trial transcript: Volume 2, Page 97, line 22 – Page 98, line 5.
[10] Trial transcript, Volume 2, page 86, line 23 to page 87, line 20.
[11] Trial transcript, Volume 2, page 88, lines 3-11.
[12] Trial transcript, Volume 2, page 88, lines 14-17.
[13] Trial transcript, Volume 2, page 137, lines 16-25 – 138, lines 17 – page 139, line 21. Mr. McLaurin's counsel refers in the trial transcript to one of his depositions of Ms. Mohamed as Defendant's D10.

difficulty of working through interpreters. There was a lengthy cross-examination[14]

and redirect[15] of Ms. Mohamed about the meaning of "single woman" and

Ms. Mohamed testified that on another occasion, Mr. McLaurin came into

her home without notice or knocking and saw her half naked.

> I was just come from the shower, putting on my pants, one leg, and the other leg I didn't put it still, and he just come in and stand beside me in the room while I was naked, and I tell him, "Please, make him get out of here. You don't see me. I'm naked," and he said, "Young woman, this is my house." That's what he told me.[16]

Ms. Mohamed testified that on a third occasion, Mr. McLaurin came upstairs

from the garage and was standing in the doorway. He told her, "Your boyfriend is

not allowed to be here."[17] Ms. Mohamed testified that Mr. McLaurin came into her

living room where her young children were all sitting around her and said, "I didn't

rent -- you didn't rent my apartment to have sex in."[18] Ms. Mohamed also testified

that Mr. McLaurin once came into her apartment at 2 a.m.[19]

Mr. McLaurin testified that he entered the plaintiffs' home without notice

thirty times.[20] Mr. McLaurin also testified that he only entered the plaintiffs' home

without notice when there was an emergency.[21] Mr. McLaurin testified that he got

more than twenty phone calls from Mr. Thapa.[22] Krisna Thapa, the tenant living

---

[14] Trial transcript, Volume 3, page 36, line 15 – page 37, line 7.
[15] Trial transcript, Volume 3, page 37, lines 1-7.
[16] Trial transcript, Volume 2, page 88, line 18 to page 89, line 6.
[17] Trial transcript: Volume 2, Page 97, lines 16-23.
[18] Trial transcript: Volume 2, Page 98, line 3.
[19] Trial transcript, Volume 2, page 86, line 14-22.
[20] Trial transcript, Volume 3, p. 79 lines 19-25.
[21] Trial transcript, Volume 3, p. 79 lines 14-18.
[22] Trial transcript, Volume 3, page 81, lines 16-20.

downstairs from plaintiffs, testified that he called Mr. McLaurin "more than 5 times" about water leaking into his apartment.[23]

Mr. McLaurin provided written notice about entry only three times, one of those notices after plaintiffs filed this law suit. Exhibit B17; Exhibit N; Exhibit A10 regarding pest control was read on the record. Exhibit Z states "I'll be checking heaters and windows the month of November" which is not sufficiently specific to provide reasonable notice of when Mr. McLaurin would be entering plaintiffs' premises.

Ms. Mohamed's husband, Hassan Kowa Al-Basha Hawan ("Mr. Hawan" for brevity), testified that Mr. McLaurin has a mini-storage, garage, or shed next to the parking lot next to the Front Street apartment building. Mr. Hawan then testified that he saw Mr. McLaurin at the storage garage "always" which he later clarified was sometimes as often as three times in a day, sometimes not for several days in a row.[24] Mr. Hawan also testified ". . . [H]e always come there if it is appointment or no appointment. He just come and opens the door and go inside that way."[25] Mr. Hawan testified that when he called Ms. Mohamed from the Sudan, he could hear Mr. McLaurin through the phone yelling at Ms. Mohamed, and she was crying.[26]

Ms. Mohamed testified that Mr. McLaurin came into her apartment many times without calling first or knocking on the door; he just came into the apartment using his key.[27] She testified that while in the apartment Mr. McLaurin was loud,

---

[23] Trial transcript: Volume 4, page 14, line 23 – page 15, line 1.
[24] Trial transcript, volume 2, page 31, lines 7-11.
[25] Trial transcript: Volume 2, page 25, lines 15-18.
[26] Trial transcript: Volume 2, page 38, line 22 – page 39, line 11.
[27] Trial transcript, Volume 2, page 79, line 25 to page 80, line 11; page 83, line 6-17; page 89, line 25 – page 90, line.

angry, and swearing.[28] She testified that her children weren't free to play outside because Mr. McLaurin yelled at them.[29] She testified that Mr. McLaurin three times took her onions, rice, and potatoes out of her cupboard and put them on the kitchen floor.[30] Mr. Hawan testified that defendant twice took down and took away the curtain plaintiffs had hung in the bathroom doorway.[31]

Even if it is credible that Mr. McLaurin, all thirty times—or more—that he was in plaintiffs' home he was there because there was "imminent danger" to "person or to property," nothing explains his failure to call or even knock before entering. More importantly, whatever his reason for entering their home, there is no non-discriminatory explanation for making derogatory remarks about Africa and telling plaintiffs they should go back there. There is no non-discriminatory reason for refusing to leave when Ms. Mohamed, who was naked or half naked, asked him to leave. There is no reason to yell at the children or tell them not to play outside. And there was no emergent reason to take their curtain twice or put their potatoes, onions, and rice on the floor.

## II.     Preliminary Questions: Post-Acquisition Conduct; National Origin

### A) Title VIII Post-Acquisition Discriminatory Conduct is Cognizable

Plaintiffs complain here of defendant's conduct which took place in plaintiffs' home after defendant had rented the dwelling to them and while they lived there, i.e., post-acquisition. The Second Circuit has not specifically held that Title VIII

---

[28] Trial transcript, Volume 2, page 85, lines 5-11.
[29] Volume 2, page 91, lines 7 – 22.
[30] Trial transcript, Volume 2, page 90, lines 2-6.
[31] Trial transcript, Volume 2, page 28, lines 7-9. Mr. Hawan's testimony including the curtain begins on page 27, line 24 but he summarizes on page 28.

reaches post-acquisition conduct; however, it has impliedly held so and it's reasoning in a recently withdrawn decision, strongly suggest that it believes post-acquisition conduct to be covered. Further, the reasoning in the withdrawn case is the same as that of five other circuits.

In *Khalil v. Farash Corp.*, 277 F. App'x 81 (2d Cir. 2008) (not chosen for inclusion in reporter), the Second Circuit assumed without deciding that, at least in the context of termination or non-renewal of tenancy by a landlord, post-acquisition conduct is cognizable under Title VIII of the Civil Rights Act.[32] The *Khalil* plaintiffs were residential rental tenants who sued their landlord after the landlord refused to renew their tenancies. The *Khalil* plaintiffs were tenants of the defendant at the time the *Khalil* defendant landlord refused to renew their leases; thus, the conduct complained of was necessarily post-acquisition. By considering the plaintiffs' claims, the Second Circuit impliedly accepted that Title VIII discrimination that occurs post-acquisition violates the Act.

In *Francis v Kings Manor*, 917 F.3d 109 at 118 (2d Cir. 2019) (withdrawn), the Second Circuit again considered post-acquisition conduct allegedly violating the Fair Housing Act: harassment by one tenant of another tenant based on race, national origin, and religion. Looking first to Title VIII's statutory language prohibiting discrimination in "conditions" and "privileges," the *Francis* court reasoned that the plain reading of the statute is that Title VIII reaches post-acquisition conduct[33] and that the closeness of the text in Title VII and their related purposes also dictates this

---

[32] 42 U.S.C. § 3601 et seq., also referred to as the "Fair Housing Act."
[33] *Id.* at 117.

conclusion.[34] Next, the *Francis* court cites five other circuit courts' opinions holding that the post-acquisition conduct is covered;[35] notes that the Second Circuit reviewed post-acquisition conduct under the Fair Housing Act in *Khalil*; and also cites several academic articles.[36] Further, the *Francis* court reasons, the federal agency charged with administering Title VIII—the United States Department of Housing and Urban Development's (HUD's) regulations[37] apply to post-acquisition conduct. The *Francis* dissent agreed that some post-acquisition conduct is cognizable under Section 3617.[38] The dissent's objection was to the liability of a landlord under 3617 for harassment by a third party—another tenant—and that, in the dissent's view, non-harassment by other tenants is not a privilege of tenancy.

Several district courts in the Second Circuit have held that post-acquisition conduct is covered. *Davis v. City of New York*, 902 F. Supp. 2d 405, 435 (S.D.N.Y. 2012) ("Limiting section 3604(b) [to pre-acquisition conduct] would insulate egregious post-acquisition actions from the law's reach."); see also *DeSouza v. Park W. Apartments, Inc.*, 2018 WL 2990099, at 7 n.17 (D. Conn. June 14, 2018). Thus, plaintiffs suggest that the post-acquisition housing discrimination plaintiffs' allege

---

[34] *Id.* at 117-18.

[35] *Id.* at 118 (citing *Cox v. City of Dallas*, 430 F.3d 734, 746 (5th Cir. 2005); see *Modesto*, 583 F.3d at 714; *Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1263–64, 1268 (11th Cir. 2002); *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 985–86 (4th Cir. 1984); see also *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 347 (6th Cir. 1994); *Bloch*, 587 F.3d 772).

[36] Including Robert G. Schwemm, Neighbor-on-Neighbor Harassment: Does the Fair Housing Act Make a Federal Case out of It ?, 61 Case W. Res. L. Rev. 865 (2011) which discusses the statutory and regulatory argument that Title VIII's Section 3617 "interfere with" clause does not require the level of egregious conduct courts had required as of the article's writing.
Available at: https://scholarlycommons.law.case.edu/caselrev/vol61/iss3/6 which also argues that the standard, borrowed from Title VII, typically applied at that time by courts to Section 3617 imposes a more egregious level of conduct than is contemplated by the statutory and regulatory language of Section 3617.

[37] *Id.* at 119.

[38] *Id.* at 128.

here is a cognizable Title VIII claim here where the allegation is that the discriminatory acts were by the defendant landlord himself.

### B) "National Origin" Discrimination

"National Origin" Includes Ancestry or Lineage

In the Title VII (employment) context the U.S. Supreme Court has held that the prohibited basis "national origin" includes ancestry. *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88, 94 S. Ct. 334, 336, 38 L. Ed. 2d 287 (1973) ("[t]he term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came"). Courts analyzing Fair Housing Act, Title VIII, cases follow Title VII cases. *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 934 (2d Cir.1988).

Since plaintiff Binti Mohamed was born in Somalia and all of the other plaintiffs here are her children, all of the plaintiffs are of Somali national origin. Plaintiffs move the Court to take judicial notice of the fact that Somalia is a country on the continent of Africa.

### Proof of National Origin Discrimination Does Not Require Proving That a Defendant Discriminates Against Every National Origin

On an unambiguous set of facts, one district court has held in a Title VIII that a defendant discriminated against some national origins while not discriminating against other national origins. *United States v. Dittmar Co.*, 1 EOHC ¶ 13,730 at pp. 14,626-27 (E.D. Va. 1975)(a landlord's memo to staff setting out particular national origins of applicants not to rent to and other national origins staff should rent to violated Title VIII)(attached). Given *Espinoza* (national origin includes ancestry),

plaintiffs submit that logic requires the same conclusion. The plain meaning of the verb "to discriminate" is to discern a difference. In the context of civil rights laws, "discriminate against" means to choose, limit, or prefer one over another. It would be impossible to show that a person discriminates against every national origin since the national origin preferred by the discriminator is not discriminated against.

Here, Krisna Thapa, another tenant of Mr. McLaurin's, testified that Mr. McLaurin treats him and his family well[39] and that Mr. McLaurin even framed a picture of Mr. Thapa's son that Mr. McLaurin had taken.[40]  Plaintiffs move to strike this testimony, because Mr. McLaurin's treatment of a family of a different national origin (Nepali) has no bearing on Mr. McLaurin's treatment of the plaintiffs who are of Somali national origin. Plaintiffs submit that Ms. Mohamed's and Mr. Hawan's testimony that Mr. McLaurin treated their children and badly and denigrated the continent that they are from is not less credible because defendant and one of his current tenants testified that defendant treated at least one other family from a different country, Nepal, and continent, Asia, well.

**Rule 404(a)(1) Does Not Allow Character Evidence to Prove Actions on a Particular Occasion, and Defendant's Evidence Wasn't Rule 406 Evidence.**

Rule 401(a)(1) states that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait. One of defendant's current tenants, Krisna Thapa, testified that Mr. McLaurin treats Mr. Thapa's family well. Plaintiff respectfully submits that this is character evidence offered to show that because

---

[39] Trial transcript: Volume 4, page 19, lines 1-2.
[40] Trial transcript: Volume 4, page 17, line 24 to page 18, line 16.

defendant behaves in this way towards the Thapa family, he could not have behaved

in a discriminatory and frightening manner towards plaintiffs. Plaintiffs respectfully

submit that how Mr. McLaurin treats Mr. Thapa is not 406 habit evidence. However

Mr. McLaurin treats Mr. Thapa says nothing about how he treated plaintiffs.

Plaintiffs therefore renew their objection to Mr. Thapa's testimony regarding how

Mr. McLaurin talks or behaves generally towards Mr. Thapa and his family and

move the Court to strike that evidence pursuant to FRE 401. Plaintiffs also note that

they did not put on evidence of defendant's treatment of other Somali immigrant

tenants because they believed such evidence to be inadmissible under Rules 404 and

406.

### III.   Defendant Discriminated Against Plaintiffs in Violation of Section 3617 "On Account Of" Their National Origin and Sex by "Interfering With" Their Section 3604 Rights

Section 3617 of Title VIII states:

> "[I]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."

Section 3617 employs four distinct verbs, separated by commons and the

word "or." This formulation indicates that each verb constitutes an independent

action that violates Section 3617 when done because of a prohibited basis set out in

Section 3604, such as national origin or sex. Based on the statutory language, the

Department of Housing and Urban Development's (HUD's) Section 3617

regulation,[41] and the broad, remedial purpose of the Fair Housing, Act, circuit courts

---

[41] 24 C.F.R. § 100.400. Subsection (c) of the regulation states in part:

have held that Section 3617 gives rise to several separate claims. *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327 at 330–31 (7th Cir 2004) (overruled on other grounds)(recognizing that section 3617 creates different types of claims). Among those Section 3617 claims are claims for "interference with fair housing rights;" "hostile housing environment" (or "hostile living environment"); and retaliation. *Halprin*. Also see generally, *People Helpers Foundation, Inc. v. City of Richmond*, 781 F.Supp. 1132 (E.D. Va. 1992). The elements of proof required to prove liability for Section 3617 "interference with;" "hostile housing environment;" and retaliation are different.

### A) Section 3617 Provides Independent Claims from Section 3604, But Sections 3604-3606 Enumerate Substantive Fair Housing Rights

In a recently withdrawn hostile housing environment case, the Second Circuit determined that section 3617 of the FHA reaches conduct that "would constitute discrimination in the enjoyment of residence in a dwelling or in the provision of services associated with that dwelling" *Francis v Kings Manor*, 917 F.3d 109 at 118 (2d Cir. 2019) (at 119) (quoting *The Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d at 714 (9th Cir 2009) and citing *Wetzel v. Glen St. Andrew Living Community, LLC*, 901 F.3d 856 (7th Cir 2018)). In *Francis*, the plaintiff tenant's neighboring tenant subjected plaintiff to a campaign of verbal harassment, threats,

---

"(c) Conduct made unlawful under this section includes, but is not limited to, the following:
(1) Coercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that person in connection with the sale or rental of a dwelling or in connection with a residential real estate-related transaction because of race, color, religion, sex, handicap, familial status, or national origin.
(2) Threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons."

racial epithets, and holding his fist in plaintiff's face based on plaintiff's race or color.[42]

In an earlier section 3617 case, the Second Circuit determined that the same allegedly discriminatory act, denial of tenancy, could not give rise to two claims—and two separate trials—under both section 3604(a) and section 3617. *Frazier v. Rominger*, 27 F.3d 828, 834 (2d Cir.1994)(denying new trial based in section 3617 for discriminatory denial of housing where jury had found for defendants after a 3604(a) trial for discriminatory denial of housing and holding that questioning the racial motivations of landlords is not a right under the Fair Housing Act; therefore, refusing to rent because of such questioning is not interference in violation of section 3617). The *Rominger* court noted in its decision that the Southern District had questioned "[t]he necessity of a nexus between § 3617 and the sections enumerated therein is not free from doubt." *Id.* (quoting *United States v. Weisz*, 914 F.Supp. 1050, 1054 (S.D.N.Y.1996)).

**B) Defendant "Interfered With" Plaintiffs Exercise of Their Fair Housing Rights**

**(1) Section 3617 "Interference" Elements of Proof**

The Seventh Circuit has set out the elements it finds necessary to prove a Section 3617 interference claim. *Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009). The District of Connecticut cited *Bloch's* interference elements in *Eureka V LLC v. Town of Ridgefield*, Not Reported in Fed. Supp.2011 WL 13228231 (D. Conn 2011) (citing *Bloch* and setting out the same elements of proof but holding plaintiffs had

---

[42] Given the dissent, the withdrawal appears to be related to the ruling's holding the landlord liable for one tenant's discriminatory conduct against another tenant.

failed to show the requisite intent where defendant had not yet taken the actions plaintiff feared it would). *Eureka* also cites for the same proposition *Lachira v. Sutton*, No. 3:05cv1585 (PCD), 2007 WL 1346913, at 20; 2007 U.S. Dist. LEXIS 33250 at 57 (D. Conn. May 7, 2007) and *People Helpers Foundation, Inc. v. City of Richmond*, 781 F. Supp. 1132, 1134 (E.D. Va. 1992).

The *Eureka* and *Frischolz* elements for proof of a section 3617 "interference with" claim are: 1) Plaintiff is a protected individual under the FHA; 2) Plaintiff was engaged in the exercise or enjoyment of [their] fair housing rights; 3) Defendant coerced, threatened, intimidated, or interfered with the plaintiff on account of a prohibited basis in the exercise or enjoyment of their fair housing rights; and 4) Defendant was motivated by an intent to discriminate.

A plaintiff may demonstrate that defendants had a discriminatory intent through direct or circumstantial evidence, or indirectly, through the inferential, burden-shifting *McDonnell-Douglas* test. *East-Miller v. Lake Cnty. Highway Dep't*, 421 F.3d 558, 562–63 (7th Cir. 2005).

Applying the *Eureka* and *Frischholz* Section 3617 "interference with" elements here:

1)   Plaintiff is a protected individual under the FHA.

Plaintiffs are of Somali birth or ancestry, and defendant discriminated against them because of their national origin by making derogatory statement about their national origin. Ms. Mohamed is a woman, and defendant discriminated against her by entering her home without notice or consent, waking her in her bedroom by standing in her bedroom doorway yelling at her; telling her that he didn't rent his apartment

to her to have sex in it; walking into her bathroom, opening the curtain and seeing

her naked in the shower; walking into her home while she was dressing and half

naked and refusing to leave when she asked him to; calling her "young woman"

during one incident and reminding her during both that he owned her home.

2) Plaintiff was engaged in the exercise or enjoyment of [their] fair housing rights.

Living in a dwelling is being engaged in the enjoyment of one's fair housing

rights. *Ohana v. 180 Prospect Place Realty Corp.*, 996 F.Supp. 238 (E.D.N.Y.

1998)(allegation by tenants that neighbors had engaged in discriminatory acts against

them based on race, religion, and national origin sufficient to allege intentional

interference with enjoyment of rights to fair housing which tenants had exercised by

living in the dwelling). Here, plaintiffs were living in a dwelling defendant owned

and rented to them when defendant discriminated against them.

3) Defendant interfered with plaintiffs on account of a prohibited basis in the exercise or enjoyment of their fair housing rights.

a) Defendant entered plaintiffs' home at least 30 times without consent or notice and harassed plaintiffs while he was there.

(i) Defendant entered plaintiffs' home without knocking or seeking consent, then entered the bathroom and took down the curtain hanging in the doorway, and saw Ms. Mohamed, who was showering, completely naked.

(ii) Defendant entered plaintiffs' home without notice and without seeking consent, and saw Ms. Mohamed partially naked.

     (iii)    Defendant entered plaintiffs' home without consent while all of the plaintiffs were sleeping. He proceeded to Ms. Mohamed's bedroom where she and all of the plaintiffs were sleeping and woke plaintiffs up by yelling and swearing at them.

   b)  Defendant yelled and swore at plaintiffs while he was in their home.

   c)  Defendant moved plaintiffs' food from where they were storing it and put it on the floor.

   d)  Defendant twice removed and took away a curtain that belonged to plaintiffs.

4)  Defendant was motivated by an intent to discriminate.

     (i)    Ms. Mohamed testified that Mr. McLaurin said to her "Someone like you will be better taking that to your country. They don't have the water. They don't have the food. They don't have the medical system. Somebody like you is good to go back to your country."

     (ii)    Defendant told Ms. Mohamed, "I didn't rent -- you didn't rent my apartment to have sex in."

### (2) How egregious must the conduct be to "interfere with" a person who in the exercise of their fair housing rights?

### A) Nonrenewnal of Tenancy Insufficient to Prove Interference With

In *Khalil*, the Second Circuit held that termination of tenancy by itself was not enough to prove a Section 3617 interference claim. *Khalil v. Farash Corp.*, 277 Fed.Appx. 81 (2008) (not chosen for publication in the Federal Reporter). The *Khalil* plaintiffs were three families of tenants whose leases were terminated after their children were seen playing sports on the grounds outside in violation of the

apartment complex's lease provision barring anyone from congregating outdoors. Adult tenants had also had their leases nonrenewed for congregating outside. The only evidence of interference was the termination itself.

### B) Vacating the Housing Not Required

Moving out of one's residence is not required to prove a violation of one's fair housing rights. *Paige v. New York City Housing Authority* (S.D.N.Y. 2018) Slip Copy 2018 WL 3863451 (denying defendant's motion to dismiss for lack of standing and holding "[T]he FHA provides a cause of action to any "aggrieved person," which includes any person who believes that [he or she] will be injured by a discriminatory housing practice that is about to occur. '[A] person who is likely to suffer such an injury need not wait until a discriminatory effect has been felt before bringing suit.'"), quoting *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995) (plaintiffs had standing where it had been established that a zoning ordinance will likely be applied in discriminatory manner; municipality need not have actually applied the ordinance before plaintiffs may challenge it).

In *Paige,* the low-income plaintiffs complained their subsidized public housing authority's refusal to abate lead paint in its apartment buildings was poisoning their young children and had a disparate impact under Title VIII against families with children by discouraging them from applying to live in the buildings and encouraging them to leave. Despite the significant and irreversible health impacts of lead poisoning in young children, the District Court held that the fact that plaintiffs did not move out did not deny them standing to bring their fair housing claims.

Here, plaintiff, Binti Mohamed, is also a low-income woman with children who

utilizes a housing subsidy. However, here there is no allegation that plaintiffs were under an immediate threat of irreversible harm. Plaintiffs allege that defendant interfered with them in the exercise of their fair housing rights. The fact that plaintiffs did not immediately vacate the premises does not undermine their fair housing claims.

### Seventh Circuit: Repeatedly Taking Down Mezuzot Interferes With

The Seventh Circuit held that staff "repeatedly ripping down the Blochs' mezuzot for over a year's time . . . [w]ould constitute "interference" if it was invidiously motivated." *Bloch v. Frischholz*, 587 F.3d 771, at 783. The evidence in *Bloch* also showed that the homeowners' association held intentionally held its meetings on Friday evenings to pervert the *Bloch* plaintiff, who was a board member, from attending and changed its rules about what could be displayed in hallways. The *Bloch* court held that Section 3617 reaches a broader range of post-acquisition conduct than Section 3617. Further, unlike a Section 3604(a) claim, the Seventh Circuit held, a claim for coercion, intimidation, threats, and interference with or on account of plaintiff's § 3604 rights does not require that the plaintiff actually vacate the premises. *Bloch* at 782 (denying summary judgment on plaintiffs' Section 3617 claim of interference with the rights guaranteed them under Section 3604 despite holding that plaintiffs, because they never vacated, had failed to prove their Section 3604(a) claim).

### Eastern District of Virginia: Derogatory Remarks, Standing in Front of Residence, and Taking Photographs Constitutes Interference With

The Eastern District of Virginia, denying defendants motion to dismiss plaintiffs' Section 3617 interference claim stated, "[n]either the cases nor the

legislative history of § 3617 attempt to define the minimum level of intimidation or coercion necessary to violate this statute. Therefore, the Court assumes that the words of the statute—"coerce, intimidate, threaten or interfere"—mean exactly what they say." *People Helpers Foundation, Inc. v. City of Richmond*, 1992781 F.Supp. 1132 (E.D. Va. 1992) (holding that a jury could find that defendants actions: derogatory remarks, organizing neighbors to stand in front of the building, and taking photographs of tenants in order to threaten and intimidate them and employees of an organization helping them, were sufficient to prove interference in violation of Section 3617).

Defendant's actions here go beyond either repeatedly taking down a religious fixture or standing outside, taking photographs, and making derogatory remarks or only making derogatory remarks and to well beyond mere termination of tenancy. Defendant engaged in a pattern of behavior, because of Ms. Mohamed's sex and all of the plaintiffs' national origin, inside the plaintiffs' home and in the area immediately outside where the minor plaintiffs should have been able to play, that interfered with plaintiffs' enjoyment of their fair housing right to live peacefully.

Ms. Mohamed testified that her children were afraid of and ran from defendant. She testified that one of her sons, running away from defendant because he was afraid of him, fell on the stairs and was crying.[43] She testified that this son had nightmares three nights and woke up saying, "Michael is here."[44] Ms. Mohamed testified that her children, all but the oldest, slept in her bedroom because they were

---

[43] Trial transcript, Volume 2, page 86, lines 9-10; page 91, lines 14-19; page 93, lines 5-7.
[44] Trial Transcript: Volume 2, page 109, line 4 - page 111, line 2

afraid of defendant.[45] Defendant let himself into their home while everyone was asleep, stood in the bedroom doorway to Ms. Mohamed's bedroom and woke the plaintiffs up by yelling at them.[46]

Defendant yelled and swore at plaintiffs. He denigrated Ms. Mohamed's country of birth and told her she and her children should go back there. He put their food on the floor. He tore down and took away the curtain covering their bathroom door. He saw Ms. Mohamed naked and partially naked and told her he didn't rent his apartment to her to have sex in. When defendant entered her home and her bathroom while she was showering and saw her naked, Ms. Mohamed said, "I'm naked. I am taking bath. Please get out of here." And he told me, 'This is my apartment. I own the building.'"[47] When defendant entered her home while she was half naked, she asked him to leave because she was naked, he responded by saying, "young woman, this is my house."[48]

Ms. Mohamed testified that she became pregnant during the time she lived in the Front Street apartment[49] and that she had to see a specialist during the pregnancy,[50] and lost thirty pounds during the pregnancy.[51]

**Damages**

Plaintiffs here seek $200,000 in compensatory damages for the emotional distress they suffered because of defendant's violations of Title VIII. District courts in

---

[45] Trial Transcript: Volume 2, page 108, line 23 – page 109, line 3.
[46] Trial Transcript: Volume 2, page 84, lines 2-20.
[47] Trial Transcript: Volume 2, page 88, lines 9-11.
[48] Trial Transcript: Volume 2, page 89, line 2.
[49] Trial Transcript: Volume 2, page 101, lines 23-25.
[50] Trial Transcript: Volume 2, page 102, lines 20-25 – page 103, lines 1-5.
[51] Trial Transcript: Volume 2, page 104, lines 16-21.

the Second Circuit have awarded similar amounts for violations of Title VIII and other civil rights cases.

"It is a basic principle of tort law in general, and of civil rights law in particular, that compensable injuries may include not only monetary losses such as out-of-pocket expenses but also injuries such as 'personal humiliation' and 'mental anguish.'" *Henry v. Gross*, 803 F.2d 757, 768 (2d Cir.1986) (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306–08, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986)).

In 1997, the Southern District of New York upheld an emotional distress award of $228,000 in a Title VIII racial discrimination case where married couple was denied an apartment, stating "[t]he Court is mindful that "[i]n the face of persistent housing discrimination . . . the genuine emotional pain associated with such discrimination should not be devalued by unreasonably low compensatory damage awards, especially when one considers the difficulty a plaintiff faces in establishing that he or she was a victim of housing discrimination." *Broome v. Biondi*, 17 F.Supp.2d 211 (S.D.N.Y. 1997) at 226.

The District of Connecticut upheld a $100,000 emotional distress award in Title VIII eviction case. *Parris v. Pappas*, 844 F. Supp. 2d 271, 279–80 (D. Conn. 2012). *Parris* cites *Thorsen v. County of Nassau*, 722 F.Supp.2d 277 (E.D.N.Y. 2010) which lowered compensatory damages from emotional distress in a Section 1983 claim for Title VII and First Amendment rights violation related to employment). But see *U.S. v. Hylton*, 944 F.Supp.2d 176, 196 (D.Conn. 2013)(acknowledging Thorsen but awarding plaintiffs $10,000 and $5,000, respectively, in emotional distress damages).

In 2010, the Eastern District of New York, considered compensatory damages from emotional distress in a Section 1983 claim for violation of Title VII and First Amendment rights related to employment. *Thorsen v. County of Nassau*, 722 F.Supp.2d 277 (E.D.N.Y. 2010). The *Thorsen* court, in explaining its rationale for lowering the award from $1,500,000 to $500,000, categorized emotional distress awards in the Second Circuit into three groups and assigned dollar amounts to each category: "garden variety," significant, and egregious and surveying Second Circuit and district court awards in civil rights cases.

The New York Appellate Division in 1996 affirmed a $100,000 compensatory damages award for emotional distress caused by a Fair Housing Act violation for discrimination on the basis of sexual orientation and disability over an 18-month period. *119–121 E. 97th St. Corp. v. New York City Comm'n on Human Rights*, 220 A.D.2d 79, 81, 642 N.Y.S.2d 638 (N.Y.App.Div.1996)

**Punitive damages**

"The FHA expressly provides for the recovery of punitive damages by plaintiffs who have suffered discriminatory housing practices." *United States v. Space Hunters, Inc.*, 429 F.3d 416, 427 (2d Cir.2005). "Punitive damages are limited 'to cases in which the [defendant] has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual.' " *Id.* (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529–30, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)). "An award of punitive damages is not a matter of right but is within the discretion of the trier of the facts and will depend upon the degree of wanton and willful conduct of the defendant." *Parris v. Pappas*,

844 F.Supp.2d 271, 281 (D.Conn.2012) (citing *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir.1974)).

Ms. Mohamed testified to how defendant's treatment of her and her family affected her.

> I had a bad experience of -- between my kids and me, whatever happened was so bad experience that if I remember, any time I remember, my hands, my legs are all frozen, and I can't even talk.[52]

> The world become like this, the inside of this cup. So me and my kids, the world become like that, so that's why I feel. What I mean is when me and seven children are in this cup, that I can turn my body this side or this side, I'm kind of, like, tied in that cup. That's what I mean, when the world become to me like that.
> Q: And what was it that caused your world to become like that?
> If they go outside, as kids, they feel happy when they go outside. They can't go outside. Again, inside, Mr. McLaurin say they break something again, so it's kind of like come into the house and sitting somewhere the whole time not moving.[53]

Plaintiffs seek $200,000 in compensatory damages for emotional distress, costs, and attorneys' fees, and an order that defendant attend six hours of housing discrimination training given by the Vermont Human Rights Commission or another trainer of Ms. Mohamed's choosing.

Dated in Burlington, Vermont, April 29, 2019.

/s/ Rachel A. Batterson
Rachel A. Batterson, Esq.
Vermont Legal Aid, Inc.
264 N. Winooski Ave.
Burlington, VT 05401
Telephone: (802) 863-5620
Fax: (802) 863-7152
Email: rbatterson@vtlegalaid.org

---

[52] Trial Transcript: Volume 2, page 103, lines 13-16.
[53] Page 103, lines 24-25 – page 104, lines 1-15.

**<u>Certificate of Service</u>**

I hereby certify that on April 29, 2019, I electronically filed with the Clerk of Court

Plaintiffs' Proposed Conclusions of Law using the CM/ECF system. The CM/ECF

system will provide service of such filing via Notice of Electronic Filing (NEF) to the

following NEF-registered parties:

      Jerome Diamond, Esq.

This document will be further served by first class mail on the following persons

entitled to notice but not registered to receive electronic notice on the Notice of

Electronic Filing:

      <u>None</u>.

Dated in Burlington, Vermont, April 29, 2019.

                  <u>/s/ Rachel A. Batterson</u>
                  Rachel A Batterson, Esq.
                  Vermont Legal Aid, Inc.
                  264 N. Winooski Ave.
                  Burlington, VT 05401
                  Telephone: (802) 863-5620
                  Fax: (802) 863-7152
                  Email: <u>rbatterson@vtlegalaid.org</u>