U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2019 MAY 30  PM 2: 17**

CLERK

BY_____ $\mu\nu$_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

BINTI O. MOHAMED, H.M.A., A.O.A.,  )
K.H.K., F.H.K., M.H.K., S.H.K., and S.H.K.,  )
                                        )
        Plaintiffs,                     )
                                        )
    v.                                  )        Case No. 2:17-cv-73
                                        )
MICHAEL MCLAURIN,                       )
                                        )
        Defendant.                      )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On April 27, 2017, Plaintiffs Binti O. Mohamed and her minor children, H.M.A.,[1]

A.O.A., K.H.K., F.H.K., M.H.K., S.H.K., and S.H.K., filed this civil rights action against

Defendant Michael McLaurin alleging violations of the Fair Housing Act of 1968 as

amended (the "FHA"), 42 U.S.C. §§ 3601-31, based on national origin, religious, gender,

and familial status. Plaintiffs allege that Defendant "interfer[ed] with the exercise of their

civil rights under 42 U.S.C. §[] 3617 to live in housing." (Doc. 94 at 1.) Defendant

denies Plaintiffs' allegations.

On February 11, 13-15, 2019, the court conducted a bench trial at which it granted

Defendant's motion for judgment as a matter law at the close of Plaintiffs' evidence and

dismissed Plaintiffs' religious and familial status claims. Plaintiffs called Plaintiff Binti

Mohamed and Hassan Kowa El-Basha as witnesses. Defendant called himself, Joseph

McSweeney, Raymond Greenwood, Krishna Thapa, and Richard Winegar[2] as witnesses.

---

[1] The parties agreed that the claims of H.M.A. would be dismissed when he failed to appear for
his deposition. Plaintiff's counsel confirmed their dismissal at the court's bench trial. (Doc. 90
at 9.)

[2] Mr. Winegar is the custodian of records for the Burlington Housing Authority ("BHA").

On April 29, 2019, Plaintiffs submitted their post-trial memorandum, at which time the court took the matter under advisement.[3]

Plaintiffs are represented by Rachel A. Batterson, Esq. and Erika L. Johnson, Esq. Defendant is represented by M. Jerome Diamond, Esq.

## I.    Findings of Fact.

Based upon the preponderance of the evidence, the court makes the following findings of fact:

### The Parties and the 74 Front Street Apartment

1.    On or about February 9, 2016, Plaintiff[4] and Defendant entered into a one-year lease (the "Lease") for a five-bedroom, one-bathroom apartment located at 74 Front Street in Burlington, Vermont (the "apartment"). 74 Front Street is a multi-unit apartment building which Defendant inherited from his father.

2.    Plaintiff's tenancy in the apartment was subsidized by the Section 8 Housing Voucher program which paid a portion of her rent.

3.    Plaintiff and her minor children occupied the apartment from on or about February 1, 2016 until they vacated it at some point after January 5, 2018.[5]

4.    Plaintiff is a female born in Somalia who moved to a refugee camp in Kenya before immigrating to the United States. She is the mother of eight children, six of her children are also the children of Hassan Kowa El-Basha, and two of them are from a prior marriage. Before moving to Vermont, Plaintiff lived in Arizona for an unspecified period of time.

5.    Plaintiff works full-time as a cleaner in a retirement home. Although she testified that she does not work on the weekends, in her unsworn answers to interrogatories she provided a work schedule which includes weekends.

---

[3] In their post-trial memorandum, Plaintiffs ask the court to strike certain evidence from the record. This motion is untimely. *See United States v. Check*, 582 F.2d 668, 676 (2d Cir. 1978) (noting the "traditional view" that "a motion to strike[] is untimely only if the . . . motion to strike[] was not 'made as soon as the ground of it is known, or reasonably should have been known to the objector.'") (quoting 21 C. Wright & K. Graham, Federal Practice & Procedure: Evidence § 5037 (1977)). The court further finds that the evidence subject to the motion to strike is relevant to a contested issue. *See* Fed. R. Evid. 402.

[4] The court's use of "Plaintiff" hereinafter refers to Plaintiff Binti Mohamed.

[5] On January 5, 2018, Plaintiff filed a motion for a temporary restraining order and preliminary injunction (the "motion for a TRO") related to a broken doorframe and lock to the apartment which were reported to the police. *See* Doc. 33 at 33-4.

6. Plaintiff has some ability to speak and understand English, however, she is not fluent. She credibly testified that she is able to communicate with her work supervisor without difficulty. She can also write her own name in English, but she is unable to read in any language. Based upon the content and manner of her testimony, she appears to be both intelligent and assertive.

7. Defendant is a large African American male who is partially disabled because of a condition in his knees that makes it difficult for him to walk and climb stairs. He has a loud voice and an animated manner.

8. Defendant's witness, Joseph McSweeney, has worked for Defendant as a handyman for approximately five years and has known Defendant since they were both children although he had no contact with Defendant for an approximately fifteen-year period during which Defendant lived in Florida. Prior to working for Defendant, Mr. McSweeney worked as general contractor performing carpentry, painting, roofing, and various maintenance tasks with the exception of plumbing and electrical work. Although Mr. McSweeney is Defendant's employee, the court found no evidence of bias and further found his testimony wholly credible. Mr. McSweeney encountered Plaintiff approximately fifteen times during her tenancy in the apartment. Although Plaintiff's English was imperfect, Mr. McSweeney could understand her.

9. During Plaintiff's tenancy in the apartment, all of the occupants of 74 Front Street were persons of color who had immigrated to the United States. They included witness Krishna Thapa's family from Bhutan who had emigrated from Nepal and which consisted of three men, three women, and two children. Another family that occupied a unit included two generations of family members, all of whom immigrated from Nepal. Four young men from Africa who were part of the "lost boys" occupied another unit. Other than Plaintiff and her minor children, the tenants of 74 Front Street were all long-term tenants.

10. A small parking lot behind 74 Front Street is accessed by a driveway. Each apartment at 74 Front Street is allotted one parking space per family. There are no visitor parking spaces.

11. A storage shed is located at the edge of the parking lot. During the course of Plaintiff's tenancy in the apartment, Defendant and Mr. McSweeney accessed the storage shed frequently in order to perform repairs at 74 Front Street.

12. Defendant did not live at 74 Front Street and was reluctant to visit the property after hours. From 8:00 p.m. until 5:00 a.m., he would not accept phone calls from tenants. If a tenant needed to contact him, he or she was

3

required to send him a text message. Because of his disability, Defendant was also reluctant to climb the stairs to the apartment unless he needed to investigate a problem.

## The Rental Application

13. Plaintiff submitted a rental application for the apartment with the assistance of Hassan Noor, an interpreter who assists with refugee resettlement in the Burlington, Vermont area. In her rental application, Plaintiff identified Hassan Noor as her brother although she is not related to him. In the application, Plaintiff did not respond to a request for information regarding her driver's license. She provided information regarding her vehicle, but not its license plate number. In response to a request to "[l]ist everyone, including children, who will live with you[,]" Plaintiff identified three sons and one daughter. (Def. Ex. A at 1.) There is no evidence that Plaintiff intentionally misrepresented the number of children who would reside with her, her relationship with Hassan Noor, or information regarding her vehicle's license plate number.

14. The rental application for the apartment required the applicant to identify the number and type of pets the applicant seeks to have in the rental property; this section of the rental application is crossed out.

15. A Housing Assistance Payments Contract ("HAP") for Section 8 Tenant-Based Assistance Housing Choice Voucher Program identifies Plaintiff and seven of her children as the "persons [who] may reside in the unit" and states that "[o]ther persons may not be added to the household without prior written approval of the owner and the [HAP]." (Def. Ex. B at 1.)

## The Lease

16. The Lease is set forth on a form which states it was "created by Vermont Apartment Owners Association, LLC for the personal use of VAOA members." (Def. Ex. C at 1.) It provides for a one-year rental period at a monthly rent of $1,947 due on the first of the month and a security deposit of $1,947. Pursuant to the Lease, the tenant is responsible for all utilities except water, trash, and snowplowing.

17. The Lease states that no security deposit has been provided for pets and further states: "No animals shall be permitted on the premises except those pets which are identified in the attached Lease Addendum." *Id.* at 4, ¶ 14.

18. With regard to "Acceptance of the Premises," the Lease states as follows:

Tenant has inspected the leased premises, and Tenant's acceptance of possession of the leased premises is conclusive evidence of its receipt in good order and repair, in the condition as set forth on the inspection checklist. Upon the termination of this lease, the Tenant

4

shall thoroughly clean the leased premises and shall leave the premises and the improvements therein, in the same condition as at the commencement of this Lease, reasonable wear and tear excepted.

*Id.* at 3, ¶ 9.

19. The Lease sets forth the following tenant obligations regarding common areas: "The sidewalk, entrance, hall, passages, stairways, and other common areas shall not be obstructed by Tenant or used by Tenant for any other purpose than those of ingress and egress from the leased premises." *Id.* at ¶ 12.

20. The Lease provides that: "Tenant shall park in the space, if any, designated by the landlord. Only the following vehicles, of the undersigned tenants shall be permitted to be parked on the leased premises[.]" *Id.* The Lease identifies Plaintiff's vehicle by make, model, year, and license plate number and states that: "No unlicensed, unregistered, or inoperable motor vehicles can be parked or stored at the leased premises." *Id.*

21. With regard to "Refuse," the Lease states: "Tenant shall dispose of all garbage and refuse in such a manner and at such times as Landlord shall direct" and "[t]he tenant shall maintain their unit free from rodent and insect infestations, including bed bugs. Tenant shall be responsible for extermination when the infestation is caused by Tenant's failure to maintain the dwelling unit or the Tenant introduces the rodent or insect into the unit." *Id.* at 4, ¶¶ 13, 15.

22. The Lease sets forth the following obligations with regard to repairs and maintenance:

Landlord shall be responsible for all repairs and maintenance with respect to the leased premises except such repairs and maintenance as are caused by the negligent or deliberate act or omission of the Tenant or a person on the leased premises with the Tenant's consent. Those repairs and maintenance which are the responsibility of the Tenant shall be performed by a contractor approved by the Landlord immediately upon demand of the Landlord. If the repairs or maintenance which are the obligation of the Tenant are performed by the Landlord, the cost of such repairs and maintenance shall be paid by the Tenant in full on the next rental payment date hereunder as additional rental, or may be deducted from the Tenant's security deposit.

*Id.* at 5-6, ¶ 16.

23. The section of the Lease governing "Access" states as follows:

5

The Landlord may enter the leased premises with the Tenant's consent, which consent shall not be unreasonably withheld.

The Landlord may enter the leased premises for the following purposes between the hours of 9:00 a.m. and 9:00 p.m. but on not less than 48 hours notice: 1) when necessary to inspect the leased premises; 2) to make necessary or agreed repairs, alterations or improvements[;] 3) to supply agreed services; or 4) to exhibit the leased premises to perspective or actual purchasers, mortgagees, Tenants, workers or contractors.

The Landlord may only enter the leased premises without consent or notice when the Landlord has [a] reasonable belief that there is imminent danger to any person or to property.

*Id.* at 6, ¶ 18.

24. With regard to termination, the Lease provides:

If this is a month to month lease, the Landlord may terminate the lease for no cause by actual notice given to the Tenant at least 30 days prior to the termination date specified in the notice.

If this lease is for a term longer than month to month, tenant acknowledges that execution of this lease is receipt of written notice that this lease terminates for no cause upon the expiration of the initial term unless otherwise renewed or extended in writing by the landlord. No additional notice shall be required.

*Id.* at 5, ¶ 15.

25. Plaintiff received a copy of the Lease and Hassan Noor translated it for her before she signed it.

26. Because Plaintiff did not have sufficient funds for a security deposit, Defendant allowed her to pay the security deposit in installments. On several occasions thereafter, Plaintiff paid her portion of the rent late. Defendant accepted Plaintiff's late payments and charged Plaintiff a late fee.

**Inspections**

27. Before Plaintiff and her minor children moved into the apartment, Defendant installed new carpeting and kitchen cabinets and painted the walls. Prior to her occupancy of the apartment, Plaintiff and Defendant conducted a joint inspection with Hassan Noor acting as Plaintiff's interpreter. Plaintiff and Defendant completed a three-page checklist which noted no problems, including no problems with the apartment's bathroom sink. Hassan Noor translated the inspection report for Plaintiff before she signed it.

28.	Because Plaintiff was eligible for Section 8 housing benefits, the BHA was involved in the inspection of the apartment. On February 1, 2016, BHA completed a six-page U.S. Department of Housing and Urban Development ("HUD") Inspection Checklist which indicated that the apartment "passed" although a "fail" was indicated for lead-based paint in the living room. The refrigerator, stove, toilet, wash basin, and shower/tub were all marked "pass." (Def. Exs. I1 & I2.)

29.	BHA's May 12, 2016 inspection report indicates that the apartment first failed and then passed inspection with the following summary explanation:

Kitchen

1.	Refrigerator doors need adjusting not closing properly and hitting one another when trying to close one of them.

Bathroom

2.	Tub is not draining properly.

Front entrance stairway[.] Tenant Responsibility[.]

3.	Bed frame parts at the bottom of the stairs must be removed.

2.	Large boxes at the top of the stair landing need to be removed. Stairway must be kept clear at all times.

June 10 of 2016 reinspection by Rich – FAIL

The items marked are completed and approved.

1.	The lower refrigerator door does not shut properly. There's a large air gap around the seal.

2.	This item is still pending. Tenant responsibility.

June 27, 2016 reinspected by Rich – PASS

(Def. Ex. I3 at 1.)

30.	A May 12, 2016 HUD Inspection Checklist indicates the apartment passed inspection although the refrigerator, tub/shower unit, and security were flagged as a "fail."

31.	On June 27, 2017, BHA inspected the apartment and initially found it failed inspection. BHA re-inspected the apartment on July 27, 2017, and August 11, 2017, and "failed" it on both occasions. On September 11, 2017, upon BHA's re-inspection, the apartment "passed." The summary report that accompanies these inspections contains the following notations:

Housekeeping was found to be substandard and will need some corrective actions.

Enclosed porch area has piles of dirty laundry and other miscellaneous material that needs to be picked up, place[d] neat and the rug needs to be vacuumed.

The door to this room is also broken… Tenant needs to replace the door.

All bedrooms have clutter that needs to be picked up and made neat… all rugs also need to be vacuumed.

LANDLORD RESPONSIBILITIES

1. Smoke detectors were beeping. Batteries need changing. Informed landlord.

2. Bathroom sink has leaking pipe underneath.

3. Front right stove burner is not operating.

July 27, 2017 special reinspection by JL. [F]ail

Marked items are completed, inspected and approved.

Pending item:

The door to the porch area still needs to be replaced due to tenant damage.

August 11, 2017 reinspection by JL. Fail

Door has not been worked on. Tenant stated landlord telephoned her last week that someone would be up to do the door but no one showed up.

September 11, 2017 Reinspection by Rich-PASS

The bedroom door has been replaced.

The heater in the bathroom was checked and found to be in working order.

The tenant stated that there was a leak in the bathroom sink. There was a bucket of water under the drain but the leak could not be found.

(Def. Ex. I3 at 2-3.)

## Hassan Kowa El-Basha's Occupancy of the Apartment

32. Hassan Kowa El-Basha was not identified on the Lease as an occupant of the apartment. He nonetheless credibly testified that during Plaintiff's tenancy in the apartment, he lived there and did not have his own apartment elsewhere.

33. Mr. El-Basha worked nights, from 9:00 p.m. to 5:00 a.m., and would spend his days at the apartment watching his and Plaintiff's children, taking them to school and appointments, and sleeping. He described himself as married to Plaintiff and the father of six of her children.

34. In contrast, Plaintiff testified both in deposition and in the court's bench trial that, during her tenancy in the apartment, she was a single mother separated from her husband (whom she sometimes referred to as her "ex-husband") and that Mr. El-Basha lived in an apartment in Winooski, Vermont. Although he cared for the children at the apartment while she was at work, she claimed he did not live there. Plaintiff explained that in her language, to be "single" means that you are living apart from your husband.

35. Defendant credibly testified that Mr. El-Basha was consistently at the apartment during the daytime hours. Defendant repeatedly informed Plaintiff that if her husband lived in the apartment, the Lease needed to reflect that fact and she would need to pay additional rent.

36. On November 3, 2016, Defendant sent Plaintiff a letter stating in relevant part as follows:

On November 2, 2016 between the hours of 9-11am, I received a call about water leaking [through] the new ceiling. I went upstairs and ran in[to] the gentlem[a]n coming out of apartment 74 with his own key. He just finished a shower and kicked one of the cats out of the way to close the door. This gentleman is living there and nowhere on the lease. . . . Since this gentleman is living at 74 Front Street full time, the rent will be going up extra $400.00 a month. From $1,947.00 to $2,347.00 starting December 1, 2016.

(Def. Ex. A2 at 1.) There is no evidence that Plaintiff read or understood this letter.

37. The court finds that Mr. El-Basha lived at the apartment either throughout or at times during Plaintiff's tenancy and that she misrepresented this fact to Defendant and testified falsely about it both in her deposition and at trial.

## The Parking Lot and Vehicle Towing

38. At the beginning of her occupancy of the apartment, Plaintiff had a vehicle that was registered to her husband. When that vehicle broke down, her father gave her another one. According to Defendant, neither of these vehicles was registered or inspected.

39. Both Plaintiff and Mr. El-Basha parked their cars in the parking lot during Plaintiff's tenancy. Defendant advised Plaintiff that Mr. El-Basha could

not park his car in the parking lot as he was not on the Lease and there was no visitor parking.

40. On an unspecified date, Defendant sent a notice to all tenants of 74 Front Street that stated in relevant part: "Park only in your assigned parking space. If you do not, the driveway cannot be plowed. No visitor parking. The parking area is for tenants only. Vehicles belonging to visitors will be towed at their expense." (Def. Ex. G at 1, ¶¶ 6-7.) Plaintiff claims that she did not receive this notice.

41. Defendant asked Plaintiff to remove her vehicles from the parking lot and advised her that if she did not, they would be towed. In response, Plaintiff refused to remove the vehicles and slammed the door on Defendant. Thereafter, Defendant twice had Plaintiff's vehicles towed and sought to have Plaintiff's vehicle towed on a third occasion when the parking lot required snow plowing. On that third occasion, Defendant was unable to hire a tow truck.

42. To protest the continuing dispute regarding parking spaces and vehicle towing, on an unspecified date during the summer, Plaintiff sat down in the driveway to 74 Front Street to prevent Defendant's truck from exiting the parking lot. Both Defendant, as the truck's operator, and Mr. McSweeney, as its sole passenger, credibly testified that during this event Plaintiff sat on the pavement without her headscarf for between fifteen to thirty minutes yelling at Defendant. Plaintiff denies this event took place. The court finds her testimony on this point untruthful.

## Defendant's Conduct Towards Plaintiff's Children

43. Both Plaintiff and Mr. El-Basha credibly testified that Defendant yelled and swore frequently at their children while they played outside. Defendant told Mr. El-Basha that his children were filthy and were making a mess on the bathroom floor. While Mr. El-Basha was in the Sudan with Plaintiff's older children, he called Plaintiff and could hear Defendant arguing with her in the background. Plaintiff was crying at the time. In order to avoid Defendant, Plaintiff's children limited their outdoor play while living at the apartment.

44. Plaintiff testified that prior to their experience with Defendant, her children had never seen a person yelling. The court finds this testimony not credible. Plaintiff further testified that she further believed that her children were targeted by Defendant because she was a single woman without a man to protect her. The court finds that this accurately reflects her perception, but is inconsistent with evidence that Mr. El-Basha lived at the apartment.

45. Plaintiff testified that one of her children had nightmares for two nights after falling on the steps (without injury) while running away from

Defendant and another child stopped watching television. Plaintiff claims her children were afraid to open the refrigerator for fear that Defendant would yell at them. Although her children used to run out and greet her when she returned from work, they ceased greeting her in this manner while they lived at the apartment. Since vacating the apartment, her children have resumed their practice of greeting her outside when she returns home from work.

46. During her tenancy in the apartment, Plaintiff's children attended counseling, but no counseling records were introduced into evidence.

47. Defendant acknowledges that he has a loud voice which can be intimidating. He conceded that he was frustrated when Plaintiff's children left their bikes and toys on the lawn which interfered with his ability to mow the grass. Plaintiff's children also left their bikes in the parking lot and deposited litter on the front steps of the building. Defendant and Plaintiff argued frequently regarding the parking lot, including in front of Plaintiff's children. After they began doing so, Defendant acknowledged that Plaintiff's children appeared frightened of him.

48. During Plaintiff's tenancy in the apartment, Krishna Thapa lived in the apartment below the one occupied by Plaintiff and her children. He credibly testified that Defendant has a habit of speaking loudly but was friendly with his children. Mr. Thapa confirmed that bikes were left in the parking lot unattended even though Defendant provided a location to store them. Mr. Thapa credibly testified that neither he nor his children experienced discrimination from Defendant.

49. On one occasion, Defendant and Mr. McSweeney saw one of Plaintiff's daughters with her leg outside a second story window in the apartment apparently in the process of climbing out of it. Defendant went upstairs to the apartment, found Mr. El-Basha asleep, and brought the child back inside. When Mr. El-Basha woke up, Defendant explained what had happened with the child and Mr. El-Basha thanked him. When asked about this event on cross-examination, Mr. El-Basha testified that he does not know whether it occurred. The court finds his testimony on this point not credible.

50. After Plaintiff vacated the apartment, she moved into an apartment two doors down from Defendant's residence where her children play outside without fear. Plaintiff's older children frequent Defendant's sister's store where they see Defendant two to three times a week. Plaintiff's younger children do not frequent the store unless they are with a parent. After Plaintiff vacated the apartment, Mr. El-Basha brought his and Plaintiff's children to Defendant's house to trick-or-treat at Halloween.

51.  The court finds that at times Defendant yelled and swore at Plaintiff's children when they played outdoors, primarily in response to their leaving their bikes and toys on the lawn and in the parking lot. The court further finds that Plaintiff's children were afraid of Defendant.

## Water Problems in the Apartment's Bathroom

52.  Plaintiff claims that shortly after she moved into the apartment, a pipe started leaking under the bathroom sink. She installed a trash can under the pipe in the sink cabinet to catch the water. She called Defendant several times to report the leak, leaving messages, but he did not return her calls. Plaintiff further claims that the following morning, Defendant presented her with a paper to sign if she wanted the sink fixed. Plaintiff refused to sign the paper because she did not understand it. She claims Defendant explained that the paper stated that her children had broken the sink. Plaintiff contends the sink was never fixed during her tenancy and that on one occasion, she forgot to empty the trash can under the sink and it overflowed. Defendant called and left a message that there was water coming through the ceiling into the apartment below which Plaintiff found confusing because no one was home at the time. Plaintiff acknowledged that she frequently uses her cell phone to make videos but did not make a video documenting the sink leaking.

53.  On May 2, 2016, Defendant sent a letter to Plaintiff that stated as follows:

Binti thank you for letting me know about the leak. But the [plumber] said, the reason why the toilet is swe[a]ting is because of the blanket you have cov[er]ing the bathroom door and the bathroom is not getting the proper air. SO NO [MORE] BLANKETS COV[ER]ING THE BATHROOM DOOR. Thank you very much. The bathroom door must stay open when no one is . . . using it. Please keep the fan also. Again thank you again[.]

(Def. Ex. I.)

54.  On May 9, 2016, Defendant sent Plaintiff a letter that stated:

Binti please keep the beds away from the electric heaters in the smaller rooms. Please do not keep open food under the sink or in the cabin[et]s, please use[] containers to put your raw food in. Please do not keep trash cans on the porches, because the respect of the other tenants[.] PLEASE DO NOT PUT OR HANG anything in front[] of the BATHROOM DOOR. Because the bathroom needs air. The plum[b]er said that. Thanks for following the rules[.]

(Def. Ex. J.)

55.  On June 1, 2016, Defendant sent Plaintiff a letter that stated:

The plumber will be there this week to fix the unplugging of the tub, and another man will be there to fix the refrigerator next week[.] Please no more floods in the bathroom cause[d] by the kids. Thank you[.]

(Def. Ex. N.)

56. During Plaintiff's tenancy, on several occasions Defendant saw large amounts of water on Plaintiff's bathroom floor including one occasion during which some of Plaintiff's children were playing in the water. Because Plaintiff hung a cloth shower curtain outside the tub, water from the shower leaked onto the bathroom floor.

57. Raymond Greenwood, a plumber, installed the apartment's sink, toilet, and shower. Prior to Plaintiff's tenancy in the apartment, he tested the plumbing in the bathroom and found it in working order with no leaks.

58. At some point during Plaintiff's tenancy, Mr. Greenwood was advised by Defendant that water was coming into the unit below the apartment through the ceiling. Defendant hired Mr. Greenwood to investigate. In response, Mr. Greenwood changed parts of the toilet in the apartment. In the course of his work, he saw at least a quart of water on the apartment's bathroom floor.

59. On several occasions, Mr. Greenwood inspected the sink in the apartment's bathroom but could not find any leaks. On one occasion, he found that a pipe had been moved under the sink, but it was not leaking. Mr. Greenwood responded three to four times to complaints that the apartment's tub was draining slowly. He fixed this issue to BHA's satisfaction.

60. During Plaintiff's tenancy in the apartment, Defendant received over twenty calls from the downstairs tenants, complaining about water leakage from the apartment. Mr. Thapa testified that on more than five occasions, he called Defendant because water was leaking from his bathroom ceiling and puddling onto the floor.

61. Photographs introduced into evidence as Def. Exs. H14-16 and H18-20 document severe water damage in Mr. Thapa's bathroom directly beneath the apartment's bathroom.

62. According to Mr. McSweeney, during Plaintiff's tenancy in the apartment, there were approximately five to six flooding incidents in Plaintiff's bathroom that damaged the downstairs apartment's bathroom ceiling and walls.

63. On two occasions during Plaintiff's tenancy in the apartment, Defendant received notices from the City of Burlington Public Works Department regarding excess water usage at 74 Front Street. Copies of these notices

dated June 13, 2016 and September 16, 2016, respectively, were introduced into evidence. *See* Def. Exs. P, W. They state in relevant part: "After your water meter was read this month, prior to our billing this account, the computer exception report flagged this account as having substantially higher consumption than your average usage." *Id.* The notices advise the property owner to check for leaks. Although the notices state they are for 72 Front Street, they pertain to the 74 Front Street account.

64. During Plaintiff's tenancy in the apartment, a Burlington Public Works representative visited 74 Front Street twice to look for leaks but found none. Defendant did not receive complaints regarding excessive water usage at 74 Front Street prior to Plaintiff's tenancy.

65. From June 24, 2016 through July 26, 2016, Defendant sent Plaintiff three letters describing the water leakage problem, the complaints from the downstairs tenants, and the repairs that had been undertaken to date. The July 26, 2016 letter was sent to Plaintiff by certified mail and was returned to Defendant as "unclaimed." (Def. Ex. S at 2.)

66. Mr. El-Basha confirmed that the tenants downstairs complained of water leaking which prompted Defendant to inspect the apartment bathroom for leaks on several occasions without finding them. In addition, Defendant showed Mr. El-Basha the water leaking from the apartment into the downstairs apartment.

67. Defendant asked Plaintiff to come downstairs to Mr. Thapa's apartment to see the leaking, but she refused to do so. Plaintiff claims that Defendant never made this request and there was no problem with leaking from the apartment's bathroom other than the leak she claims existed in the pipe underneath the sink. The court finds Plaintiff's testimony on this point not credible.

68. In response to the leaking, Defendant instructed Mr. McSweeney to take down the ceiling in Mr. Thapa's apartment and replace the sheetrock. Soon after this repair was completed, the leaking continued and damaged the new ceiling.

69. On October 24, 2016, Defendant sent Plaintiff an explanation of the costs he incurred to repair the water damage to the downstairs apartment and advised that any further damage would be billed to her.

70. On October 27, 2016, Defendant provided written notice to Plaintiff of his intent to enter the apartment on November 15, 2016 at a specified time. Among other things, the notice stated Defendant would: "Fix the Bathroom (it [might] take more th[a]n a day[.])" (Def. Ex. A1.)

71. After Plaintiff vacated the apartment, the floor to the apartment's bathroom was removed. Mr. Greenwood inspected the pipes in the floor and found

14

them in good working order. Defendant provided the downstairs tenants with a key to Plaintiff's apartment so that they could use its bathroom while the ceiling to their own bathroom was gutted and repaired. Mr. McSweeney spent approximately a month and a half performing repairs. In the course of these repairs, he saw no evidence of a leak in the apartment's bathroom sink or any other source of the flooding.

## Broken Refrigerators and Removal of Food

72. When Plaintiff's tenancy commenced, the refrigerator in the apartment was in working order but was too small for Plaintiff's large family. At BHA's request, Defendant replaced it with a larger refrigerator obtained from a company that sells reconditioned appliances.

73. Defendant claims Plaintiff placed her food in the back of the second refrigerator and freezer which caused the freezer to ice over. Defendant also saw children hanging on the refrigerator doors and swinging from them. A repairman was called to the apartment and fixed the second refrigerator. Plaintiff's spoiled food was thrown out in the course of the refrigerator repair.

74. Plaintiff called Defendant and left two messages regarding the second refrigerator before Defendant sent a repairman to fix it. Because the apartment smelled due to rotting food, Plaintiff called the police department which provided a new refrigerator from 211 housing assistance. At some point, after the power went out, Plaintiff called and left messages for Defendant that the new refrigerator was no longer working although the freezer compartment remained operational. Defendant sent someone to fix the refrigerator who determined it could not be fixed. Defendant told Plaintiff that her children had broken the refrigerator and he would not buy another one. Mr. El-Basha eventually purchased a new refrigerator for the apartment.

75. On October 10, 2016, Defendant sent Plaintiff a letter addressing the refrigerator and other issues which states in relevant part as follows:

Again [M]iss Binti, when something [is] wrong or break[s]down in the apartment you have to report the problem. Again when your refrigerator [broke]down two or three days ago, you have to tell me so I can solve the problem. Please call me when you finish cleaning the old refrigerator and I will come take away. Thanks[.]

(Def. Ex. X.)

76. On November 22, 2016, Defendant sent Plaintiff a letter about the refrigerator as follows:

Miss Mohamed my family [has] been renting apartments [for] over forty years and no one has been through three refrigerators in eight months. We had found each refrigerator with the doors loose and bent. The refrigerator [was] ice[d] over and not [kept] clean very often. The next time the refrigerator goes down for these reasons I have to charge you $500.00 for another refrigerator. The reason why the doors were loose and bent, the kids were playing on them. Please stop your kids from swinging on the refrigerator doors that's why the doors got loose and bent. The reason why the refrigerators get ice[d] over is the doors on the refrigerator is not closed or sealed all the way as well as the freezer door. Another reason why the refrigerator gets ice[d] over is you pack your groceries against the back wall of the freezer and the refrigerator cannot breathe. Please do not force your groceries against the back wall of the freezer and keep the doors close[d] and the ice won[']t [build] up in a week. Thank you[.]

(Def. Ex. A4.)

77. While using the new refrigerator in the kitchen, Plaintiff continued to operate the old refrigerator on the porch, using an extension cord from inside the apartment for electricity.

78. Mr. McSweeney entered the apartment during Plaintiff's tenancy to fix a door. He found "food all over" and found the apartment "pretty dirty." He saw a refrigerator on the porch connected to the kitchen by an extension cord that was rubbing against the refrigerator's door. He found this condition unsafe and reported it to Defendant.

79. Mr. El-Basha testified that Defendant came into the apartment and removed the dry food from the kitchen cabinets and placed it on the floor. Although Plaintiff claimed Defendant did this several times, she acknowledged she was not present during these events. Defendant claims he discovered the food issue when he entered the apartment in response to a leak in the downstairs apartment which seemed to come from Plaintiff's apartment.

80. Defendant claims that Plaintiff stored raw food under the kitchen sink and cooked food in pots and pans in the cupboards. He explained to Plaintiff that the food would spoil and attract bugs if she continued to store food in this manner. Pest control was called to perform services at 74 Front Street.

81. A photograph of the apartment's porch, introduced as Def. Ex. H17, shows some household items, clothing, and bags of trash stored there.

**Removal of the Curtain**

82. Mr. El-Basha was home during most of Defendant's visits to the apartment. He credibly testified that Defendant did not enter the apartment without an inspection-related purpose.

83. Plaintiff and Defendant agree that Defendant entered her apartment approximately three times during her tenancy while she was home and without prior notice. The court addresses these events in detail as they are central to Plaintiff's claims.

84. Plaintiff installed a plastic curtain in front of the bathroom door and the bedroom doors so that if someone opened the door, she and her daughters would not be inadvertently exposed. Because the curtain was causing condensation in the bathroom, Defendant removed the curtain without Plaintiff's consent. Mr. El-Basha was at the apartment at the time. Thereafter, Mr. El-Basha replaced the curtain with a lighter material and reinstalled it in front of the bathroom door. Defendant removed this curtain while Plaintiff was in the apartment. On this occasion, he told Plaintiff that she could have curtains in front of the bedroom doors but not in front of the bathroom door.

85. Plaintiff claims that on two occasions, Defendant entered her apartment without notice and saw her partially undressed or naked. It is not clear whether these events took place at the same time as the event described in paragraph 84. On the first occasion, Plaintiff asserts that Defendant entered the apartment while she was showering, removed the plastic curtain in front of the bathroom door, entered the bathroom, pulled back the shower curtain, and exposed her naked body (the "shower incident").

86. Plaintiff's deposition testimony, provided through an interpreter, regarding the shower incident was as follows:

    . . . I remember that one time that I was in a shower and I had a newborn baby. So, I had [the] baby at the time and I was in a shower. He just walk[ed] in the house. So, the baby wasn't in the shower. She was between the restroom and between the living room. So, I was in the shower, not the baby. So, it happened a number of time[s] that Michael will let himself inside my house without asking who is there or not.

    Q. When did he come into the shower room?

    A. I cannot recall exactly [the] time or what date it was.

    Q. What time of the year?

    A. It was in 2017, last year.

    Q. She can't remember when? Not by date but when?

    A. I cannot recall the time or date, but approximately it was on a weekend which was a Saturday--which was Saturday. So, it was on a weekend, I remember. I was in the shower. My child's name, SHK, she was only one years old at the time and I was in the shower

room and the baby was approximately like a few feet away from the bathroom that I was in. All I can hear is yelling and swearing while I was in the shower room. So, between the shower and the living room and where the baby was wasn't that far. The living room is like--the entrance between the living room and the shower room is not that far either. So, to me is I didn't want to close my door for the bathroom at the time so I had an extra curtain so it was actually hanging by the bathroom door. At the time all I can hear is somebody with [an] aggressive voice and he was mad, but I don't know why. I did not take a look. He was yelling so loud. And I had the shower curtain--before the shower curtain--there was another curtain between the living room and the bathroom and he let himself in while still screaming like a mad person. And he pulled the curtain down that was between the bathroom door. And even that he let himself into the bathroom and opened the curtain for the bathroom. Then he . . . yanked the curtain that was at the bathroom door because I did not want to close the door to the bathroom. I feel very violated to me seeing Michael acting that behavior. I am not his girlfriend, and I am not his wife. And on top of that, doing that in that behavior, acting that behavior, I was totally naked and I thought I had a privacy in my home. But, apparently, I didn't have privacy anymore. I was naked, totally naked.

Q. Where were the other children?

A. At the time my kids, they went to visit their grandma so I had me, myself, and my younger one who was actually one years old.

Q. That was it?

A. So, that was basic your question, but I am still holding more so I just want to see if you have any more question[s] for me.

Q. What did Mike say to you?

A. I was shook. So, that's not my tradition[]. And I thought that once you are a tenant, you are supposed to be to feel safe in your house or in your home that you live in.

Q. That's not my question.

. . .

A. I felt like I was safe to be in that home, on top of that. I was only tenant, correct. But to see that, I was violated. Totally I was shooked. And to experience that in action that landlord acting to that behavior is just like was so disrespectful to me.

Q. What did Michael say to you?

A. Then Michael came back to me when--another day that he was trying to tell me something. So, it was another day. I believe it was Tuesday and I had a different appointment and I cannot recall what kind of appointment I had at the time so I cannot recall what Michael had stated or what he had stated to me.

Q. Did he say nothing to her at the time she was in the shower?

A. So, to me is--at the time in the shower again, going back, I asked Michael why are you in here? Michael had said I can come into this house any time I want and it is my house. Then I replied to him I am a tenant and I know that you are [the] landlord and I am paying the money here. Like I am not really sure what your intention is. And then he said wait, young lady, this is my home and I belong here and I can walk in any time I want.

Q. That's it? That was the end of the conversation?

A. So, there is more incidents. And I believe it was more than three times. But that was the first incident that happened between me and him. So, having discussed more about it and how I feel disgusted about his action and behavior.

Q. And was she outraged?

A. It was so strange. And I was in fear at the time what this man could have done to me if he could just walk into my house, me naked. I was afraid with my life and I was afraid for that young kid that was by me. And this was what I was actually thinking about what is going to happen next. Is he going to rape me? Is this my life? This is it? This is over? What is going on? Do you have more question[s]?

Q. So, I assume that she called the Housing Authority and made a complaint against him?

A. Before I went to complain at the Housing [Authority], I got a letter from you, which was Michael's lawyer at the time, I believe. Maybe you are not, but you might be the one. That you had stated that you are going to dump everything in the house which is my belongings. Then I end up going to the Housing [Authority].

Q. So, the question I asked was - After the shower incident, did she file a complaint with the Housing Authority?

A. It wasn't [based] on the shower action behavior. It was something else that when that I went to the Housing [Authority] to complain about.

(Pl. Ex. 4 at 5-9.) Plaintiff confirmed that the issue she complained to BHA about was the refrigerator.

87. On another occasion, Plaintiff claims she was leaving the bathroom on a Saturday morning, was exiting the shower, and had put one leg of a pair of pants on when Defendant entered the apartment without notice and saw Plaintiff partially clothed. She testified that he told her: "Young woman, this is my house." (Doc. 91 at 89) (internal quotation marks omitted).

88. On a third occasion, Plaintiff testified that Defendant told her in front of her children in the living room of the apartment that he was not renting an apartment to her so that she could have sex. She claims Defendant also told her that her boyfriend was not allowed to be in the apartment when in fact it was her son who was changing into his basketball uniform. Defendant denies making these statements. Without determining the precise communications made, the court finds Defendant told Plaintiff she could not have a man staying in her apartment who was not on the Lease, that this communication took place in front of Plaintiff's children, and that Defendant may have phrased this directive in an offensive manner.

89. Plaintiff further claims that Defendant entered her bedroom one night at 2:00 a.m. and began yelling about the leak from the shower. She testified that this frightened her children so much that they were reluctant to sleep in their own rooms and insisted on sleeping in her room. Defendant denies this happened. The court finds his testimony on this point credible.

90. Defendant admits repeatedly telling Plaintiff and Mr. El-Basha to remove the curtain in front of the apartment's bathroom door as it was causing condensation. He denies ever seeing Plaintiff partially clothed or naked. The court finds his testimony regarding the shower incident partially truthful in that he did not deliberately expose Plaintiff while she was showering. The court, however, finds that Plaintiff may have been showering when Defendant removed the curtain from the bathroom door. The court finds that Plaintiff may also have been in the process of dressing when Defendant entered the apartment in response to flooding into the downstairs apartment.

**Evidence of Animus**

91. Plaintiff is a practicing Muslim who testified that she wears a headscarf at all times when she is not at home with her family and that her daughters wear headscarves as well. She testified that Defendant never saw her without a headscarf and denies that she ever sat in the driveway without a headscarf yelling at Defendant and impeding his ability to exit the driveway to 74 Front Street.

92. Both Defendant and Mr. McSweeney credibly testified that they saw Plaintiff without a headscarf in public. Defendant claims he saw Plaintiff frequently without a headscarf and that her female children also did not wear them. Defendant claims that Plaintiff only wore a headscarf on special occasions until he asked her to vacate the apartment. Mr. McSweeney testified that he saw Plaintiff only a couple of times without a headscarf. The court finds Defendant's and Mr. McSweeney's testimony on this point credible, but further finds the issue of whether Plaintiff wore a headscarf relevant only to her credibility.

93. Because they used the apartment for prayer, Plaintiff and her children left their shoes outside the door during their tenancy. Defendant entered the apartment without removing his shoes. Plaintiff did not ask him to remove them and they did not discuss her religion. Plaintiff offered no other evidence of discrimination based on her religion.

94. Plaintiff testified that on one occasion related to either the refrigerator or the food Defendant told her: "Someone like you will be better taking that to your country. They don't have the water. They don't have the food. They don't have the medical system. Somebody like you is good to go back to your country." *Id.* at 97 (internal quotation marks omitted). Defendant denies making this comment. The court finds Plaintiff's testimony credible insofar as she claims Defendant made critical comments regarding Plaintiff's housekeeping and methods of storing food and attributed those methods to her country of origin to which he suggested she return.

95. On cross-examination, Plaintiff denied that she disliked American born African-American males. In deposition, she testified:

> I'm a female, single mother, raising my -- my kids, also a hard worker, and I am a Muslim. And to me it seems like a lot of black African-American[s], they just -- they was -- all black African-American[s], they don't know how to treat any -- any kind of female with dignity and respect.

(Doc. 92 at 34) (internal quotation marks omitted).

96. Plaintiff claims that she received disparate treatment because the leaking pipe in her apartment was not fixed while other tenants' problems in their apartments were fixed in a timely manner. No evidence was introduced regarding repairs to other tenants' apartments other than the water damage to Mr. Thapa's apartment downstairs.

97. Plaintiff further asserts that she and her children received disparate treatment because her children could not play outside without Defendant yelling at them while her neighbors' children were not yelled at. Other than

Mr. Thapa's testimony, there was no evidence regarding how other children who resided at 74 Front Street were treated by Defendant.

98. Plaintiff asserts that other tenants received more favorable treatment with regard to parking spaces, but she did not identify those tenants or explain how their treatment was more favorable.

## Non-Renewal/Non-payment of Rent

99. On or about December 19, 2016, Defendant notified Plaintiff by letter that he was not going to renew the Lease when it expired in March of 2017. In this letter, Defendant explains his reasons for non-renewal as follows:

Miss Binti, several times I have asked you about the water from your bathroom leaking down[ ]stairs for ten months and no cooperation from you. I have asked you about your cats and you said you never had them up there, I have ask[ed] you to stop running the water all night, you have not stop[ped]. And your friend is still staying there at night. I have ask[ed] you to clean your own apartment and pick up after your kids, the toys, trash. You have not care[d] to do any of these things. I decided to not renew your lease because you [have] broken the lease several times. I will send you another letter in January to remind you and one to [S]ection-8, one to my lawyer.

(Def. Ex. A6.)

100. Plaintiff claims that she did not receive the December 19, 2016 letter although she acknowledges that it is her signature on the postal receipt.

101. On May 9, 2017, Plaintiff received a certified letter for which she signed the postal receipt which states:

Dear Ms. Mohamed:

I represent your landlord, Mr. Michael McLaurin, regarding your tenancy at 74 Front Street, Burlington, Vermont.

**Please be advised that your tenancy at 74 Front Street, Burlington, Vermont is terminated on June 16th, 2017 for no cause.**

This notice is being sent to you by certified mail. A previous notice had been sent to you last month, via certified mail with a return receipt requested, but you neglected to pick it up. This notice is independent of any other notices to quit you may receive or have received. This notice does not extend or alter times or obligations stated in any other notices to quit.

> Your landlord reserves all rights to receive and accept rent without waiving any of landlord's legal remedies or rights to bring an eviction action based on this notice.

(Def. Ex. A14.)

102.  Plaintiff testified that she received a letter from Defendant dated June 16th telling her that all of her belongings would be thrown out into the street which she gave to her attorney. She acknowledges that the December 19, 2016 letter does not state this but asserts that someone read the letter to her and told her that is what it said.

103.  Notwithstanding the termination notices, Plaintiff and her minor children continued to live in the apartment after the Lease expired.

104.  Defendant sent invoices to Plaintiff for alleged tenant damage to the apartment which Plaintiff did not pay.

105.  In September of 2017, Plaintiff provided a rental check for her portion of the rent which was not honored. Defendant returned the check to Plaintiff and insisted that thereafter Plaintiff pay her portion of the rent by money order.

106.  In November of 2017, Plaintiff sent Defendant a check for $217 which Defendant refused to accept. By letter dated November 8, 2017, Defendant explained his reasons for doing so as follows: "I just received for November rent in a check form. In [my] last [letter] I mention[ed] that I only take rent payment from Miss Binti Mohamed in a bank check or a money order, because she bounce[d] a check in September." (Def. Ex. B12.)

107.  Plaintiff ceased paying rent directly to Defendant and instead gave it to her lawyer. Her lawyer subsequently returned this money to Plaintiff for use as a security deposit for a new apartment.

108.  In her Amended Complaint, Plaintiff alleges that she and her children "did no damage to the apartment." (Doc. 29 at 5, ¶ 20.) Defendant, in contrast, claims that in addition to the damage to the downstairs apartment, Plaintiff or her children broke a cast iron part of the stove, damaged the carpet in the apartment as well as the kitchen cabinets, and damaged the walls, doors, and floors. Defendant claimed damages and unpaid rent in the amount of $4,944.55 and withheld Plaintiff's security deposit. Plaintiff makes no claim of wrongful withholding of her security deposit.

## II. Conclusions of Law and Analysis.

Plaintiff alleges national origin and sex discrimination in violation of 42 U.S.C. § 3604(a) and (b) of the FHA and in violation of 42 U.S.C. § 3617.[6] Regardless of how framed, Plaintiff's statutory claims allege that Defendant interfered with her right to enjoy the apartment because of a discriminatory animus towards her protected status as both a woman and a person of African descent.

Congress enacted the FHA "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. The language of the FHA "is broad and inclusive." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972). For this reason, "[i]n order to achieve its purpose, the provisions of the FHA are to be construed broadly." *Ohana v. 180 Prospect Place Realty Corp.*, 996 F. Supp. 238, 240 (E.D.N.Y. 1998); *see also Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 385 (3d Cir. 2011) ("The FHA is a broadly remedial statute designed to prevent and remedy invidious discrimination[.]").

Under the FHA, a landlord may not "refuse to sell or rent after the making of a bona fide offer, or . . . refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). "A plaintiff can make out a claim of discrimination [under the FHA] either on a theory of disparate impact or one of disparate treatment." *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 366 (2d Cir. 2003) (internal quotation marks omitted).

---

[6] The relationship between these claims is not clear. *See Frazier v. Rominger*, 27 F.3d 828, 834 (2d Cir. 1994) (rejecting the proposition that "every allegedly discriminatory denial of housing under § 3604(a) would also constitute a violation of § 3617 in that the denial 'interfered' with the prospective tenant's Fair Housing Act rights[,]" "[d]eclining to believe that Congress ever intended such a statutory overlap," and holding "the plaintiffs' sole remedy in this case existed in their § 3604(a) cause of action" because "the plaintiffs did not state a cause of action under § 3617 separate and distinct from their cause of action under § 3604(a)."); *but see Ohana v. 180 Prospect Place Realty Corp.*, 996 F. Supp. 238, 242 (E.D.N.Y. 1998) (finding that "the court's seemingly preclusive language in *Frazier* is not to be taken literally, and that the Second Circuit does indeed recognize that a claim under § 3617 could entail circumstances not embraced under [§ 3604]").

24

Under the burden-shifting framework originally established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, [] (1973), which is applicable to cases brought under the Fair Housing Act, *see Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1039 (2d Cir. 1979), if a plaintiff presents a prima facie case of discrimination, the burden of production shifts to the defendant to come forward with a "legitimate, nondiscriminatory reason" for the adverse action. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254[] (1981). If the defendant fails to offer a legitimate, nondiscriminatory reason, then the plaintiff is entitled to judgment as a matter of law.

*Frazier v. Rominger*, 27 F.3d 828, 831 (2d Cir. 1994).

42 U.S.C. § 3617 provides that:

[I]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603 [discrimination in certain federal housing], 3604 [discrimination in rental housing], 3605 [discrimination in real estate transactions], or 3606 [discrimination in brokerage services] of this title.

In order to prevail on a § 3617 claim, a plaintiff must show that: (1) she is a protected individual under the FHA; (2) she was engaged in the exercise or enjoyment of her fair housing rights; (3) the defendant was motivated by discriminatory intent, or his conduct produced a disparate impact; and (4) the defendant coerced, threatened, intimidated, or interfered with the plaintiff on account of her protected activity under the FHA. *East-Miller v. Lake Cty. Highway Dep't*, 421 F.3d 558, 563 (7th Cir. 2005). "[A] showing of intentional discrimination is an essential element of a § 3617 claim." *Id.*

In this case, Plaintiff initially alleged that she received disparate treatment as compared to other tenants of 74 Front Street. She, however, presented scant evidence in support of this claim. The only comparator evidence was introduced by Defendant who called Mr. Thapa to testify regarding the leaking into his apartment from Plaintiff's

bathroom and who acknowledged that neither he nor his children had been discriminated against by Defendant.[7]

Plaintiff introduced no evidence to support a claim of disparate treatment with regard to insufficient notice by Defendant for apartment visits, restrictions on parking and the number of vehicles permitted, Mr. El-Basha staying at the apartment without being identified on the Lease or paying additional rent, the refrigerator and food events, or the alleged leak under Plaintiff's bathroom sink not being fixed in a timely manner. Without comparator evidence, there is no means of determining whether Plaintiff was treated differently from similarly situated tenants. *See Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir. 2010) ("Disparate-treatment claims under the FHA are tested under the same framework as Title VII disparate-treatment claims[] . . . [t]he standard is familiar—did the defendant(s) treat the plaintiff(s) less favorably than others based on their race, color, religion, sex or national origin?"); *Marbly v. Home Props. of N.Y.*, 205 F. Supp. 2d 736, 744 (E.D. Mich. 2002) (granting defendant's motion for summary judgment because "[p]laintiff has not specifically alleged or supported with evidence his claims that he was denied timely maintenance" and "plaintiff has not come forward with evidence that non-minority tenants were provided timelier maintenance under similar circumstances").

In her post-trial filing, Plaintiff makes no mention of a disparate treatment claim which suggests she has abandoned this theory of recovery. To the extent she has not, the court finds that she has failed to establish the essential elements of a disparate treatment claim. *See Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003) (holding that a § 3604 claim requires a plaintiff to prove that other renters were treated differently from protected class members); *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 430 (4th Cir. 2018) (observing that "whether a plaintiff made a prima facie case of disparate-impact

---

[7] Although Defendant yelled and swore at Plaintiff's children, but not at the children of Mr. Thapa, there is no evidence that Mr. Thapa's children also left their toys and bikes in common areas of 74 Front Street. As a result, the treatment of Mr. Thapa's children is not strong comparator evidence.

liability requires courts to look at whether a protected class is disproportionately *affected* by a challenged policy").

Plaintiff's claims are more properly characterized as a post-acquisition hostile housing environment claim. The Second Circuit has not squarely concluded this claim may be brought under the FHA. In *Francis v. Kings Park Manor, Inc.*, the Second Circuit initially affirmed the district court's decision to allow the plaintiff to pursue a hostile housing environment claim, holding that "post-acquisition claims are cognizable under § 3604." *Francis v. Kings Park Manor, Inc.*, 917 F.3d 109, 117 (2d Cir. 2019) (internal quotation marks omitted). The *Francis* opinion was withdrawn on April 5, 2019, without explanation. *See Francis v. Kings Park Manor, Inc.*, 920 F.3d 168, 169 (2d Cir. 2019) ("It is hereby ORDERED that this Court's decision and opinions, issued on March 4, 2019, are WITHDRAWN."). In an unpublished summary order, the Second Circuit previously declined to determine whether a hostile housing environment claim exists under the FHA. *See Khalil v. Farash Corp.*, 277 F. App'x 81, 84 (2d Cir. 2008) ("Assuming, without deciding, that a plaintiff may state an FHA claim of discrimination . . . based on a hostile housing environment theory, we conclude that [plaintiffs] failed to introduce any record evidence of severe or persistent harassment that would support such a claim.").

Other courts, including this one, have held that a "post-acquisition" hostile housing environment claim is cognizable under § 3604 of the FHA.[8] A federal

---

[8] *See, e.g.*, *Bloch v. Frischholz*, 587 F.3d 771, 776 (7th Cir. 2009) ("[Section] 3604(a) may reach post-acquisition discriminatory conduct that makes a dwelling unavailable to the owner or tenant, somewhat like a constructive eviction."); *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 713 (9th Cir. 2009) (concluding, in the context of a claim under § 3604(b), "that the FHA reaches post-acquisition discrimination"); *Mazzocchi v. Windsor Owners Corp.*, 204 F. Supp. 3d 583, 607 (S.D.N.Y. 2016) ("[C]ourts in this Circuit have found provisions of the FHA to reach post-acquisition discrimination, even where the discriminatory conduct does not rise to the level of actual or constructive eviction[.]"); *Muhudi v. McLaurin*, Case No. 2:14-cv-251, Doc. 13 (D. Vt. May 4, 2015) (recognizing a hostile housing environment claim under § 3604(a)); *Cain v. Rambert*, 2014 WL 2440596, at *4 (E.D.N.Y. May 30, 2014) ("Courts in this Circuit have construed § 3604(b) of the FHA to prohibit the creation of a 'hostile environment' by individuals who have control or authority over the 'terms, conditions, or privileges of sale or rental of a dwelling,' similar to the prohibition imposed by Title VII against

27

regulation, promulgated under the FHA, recognizes that § 3617 prohibits "[t]hreatening, intimidating or interfering with persons in *their enjoyment of a dwelling* because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons." 24 C.F.R. § 100.400(c)(2) (emphasis supplied). In light of the broad remedial purposes of the FHA, the court predicts that the Second Circuit would likewise recognize a post-acquisition hostile housing environment claim under either § 3604 or § 3617.

## A. Whether Plaintiff Has Established Protected Status Based on National Origin and Gender.

It is uncontested that Plaintiff has protected status under the FHA based on her national origin[9] and gender.[10] She has further established by a preponderance of the

the creation of a hostile work environment."); *Davis v. City of New York*, 902 F. Supp. 2d 405, 436 (S.D.N.Y. 2012) (concluding the FHA "is best understood to prohibit post as well as pre-acquisition discrimination in the provision of housing-related services"); *Bouley v. Young-Sabourin*, 394 F. Supp. 2d 675, 678 (D. Vt. 2005) ("The plaintiff alleges the defendant unlawfully terminated her lease on the basis of sex and religion. . . . These claims, if proven, could constitute unlawful discrimination under the Fair Housing Act.") (citing *Smith v. City of Elyria*, 857 F. Supp. 1203, 1212 (N.D. Ohio 1994)).

[9] "The term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973). References to geographic areas, rather than specific countries, may be sufficient to infer national origin discrimination. *See, e.g.*, *Stern v. Trs. of Columbia Univ. in City of N.Y.*, 131 F.3d 305, 306, 312 (2d Cir. 1997) (finding a "white American male of Eastern European origin . . . had presented sufficient evidence to make out a prima facie case of discrimination on the basis of national origin."); *Kanaji v. Children's Hosp. of Phila.*, 276 F. Supp. 2d 399, 404 (E.D. Pa. 2003) ("Plaintiff's Title VII claim for 'national origin' discrimination cannot fail merely because he identifies himself in the Amended Complaint as being 'of direct African descent,' and does not specify a nation or country of origin.").

[10] "The Fair Housing Act prohibits gender-based discrimination in the rental of a dwelling, or in the provision of services in connection with a rental. 42 U.S.C. § 3604(b). Discrimination may occur either by treating one gender less favorably (disparate treatment) or by sexual harassment." *Honce v. Vigil*, 1 F.3d 1085, 1088 (10th Cir. 1993).

> [T]he legal standard for sexual harassment claims under the FHA has been analogized in the Second Circuit to the standard pertaining to hostile work environment claims under Title VII. Thus, in order to prevail in a hostile environment sexual harassment claim, [plaintiff] must establish that she was subjected to harassment that was sufficiently pervasive and severe so as to create

evidence that Defendant was aware of her national origin and gender throughout her tenancy.

## B. Whether Plaintiff Has Established Defendant Interfered with Her Enjoyment of the Apartment.

The courts that recognize a hostile housing environment claim under the FHA require a high degree of proof, effectively requiring a plaintiff to prove that the discriminatory harassment resulted in constructive eviction. As the Seventh Circuit observed: "Proving constructive eviction is a tall order . . . [o]rdinarily, the plaintiff in such a case must show her residence is 'unfit for occupancy,' often to the point that she is 'compelled to leave.'" *Bloch v. Frischholz*, 587 F.3d 771, 777 (7th Cir. 2009) (observing that "[e]ven . . . the allegations of [a defendant's] blatantly discriminatory acts, including spraying the plaintiff's yard with harmful chemicals, were insufficient to give rise to a § 3604(a) claim."); *see also Khalil*, 277 F. App'x at 84 (determining that if a hostile environment claim is held to exist, it would require "evidence of severe or persistent harassment") (citing *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (stating that hostile work environment claim under Title VII requires showing "that the complained of conduct . . . is objectively severe or pervasive") (internal quotation marks omitted)).

"To establish a claim for constructive eviction, a tenant need not move out the minute the landlord's conduct begins to render the dwelling uninhabitable . . . [t]enants have a reasonable time to vacate the premises." *Bloch*, 587 F.3d at 778. However, "[i]f the tenant fails to vacate within a reasonable time, she waives her claim for constructive eviction." *Id.* (citing *Shaker & Assocs., Inc. v. Med. Techs. Grp., Ltd.*, 733 N.E.2d 865, 873 (Ill. 2000) (ten-month delay to find new location deemed unreasonable)); *Auto.*

---

a hostile environment, and that a basis exists for imputing the allegedly harassing conduct to the defendants.

*Glover v. Jones*, 522 F. Supp. 2d 496, 503 (W.D.N.Y. 2007). "Harassment based on sex is a form of discrimination." *Honce*, 1 F.3d at 1089. The Tenth Circuit has "previously recognized two distinct categories of sexual harassment: 'quid pro quo' harassment and hostile work environment (or housing environment) harassment." *Id.* (citations omitted). The offensive acts need not be purely sexual; it is sufficient that they would not have happened but for claimant's gender." *Id.* at 1090.

*Supply Co. v. Scene-in-Action Corp.*, 172 N.E. 35, 38 (Ill. 1930) (two-month delay after loss of heat deemed unreasonable).

"Applied to the housing context, a claim [for hostile environment] is actionable when the offensive behavior unreasonably interferes with use and enjoyment of the premises." *DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996) (internal quotation marks omitted). "Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances, and factors may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance[.]" *Id.* "The harassment must be 'sufficiently severe or pervasive' to alter the conditions of the housing arrangement." *Honce v. Vigil*, 1 F.3d 1085, 1090 (10th Cir. 1993). "Casual or isolated manifestations of a discriminatory environment may not raise a cause of action." *Id.* (alterations and internal quotation marks omitted) (quoting *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1414 (10th Cir. 1987)).

"Hostile environment claims usually involve a long-lasting pattern of highly offensive behavior." *Id.*; *see, e.g.*, *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that [i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments[.]") (citations and internal quotation marks omitted). "[A] plaintiff alleging a hostile . . . environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [her living] environment." *Ghaly v. U.S. Dep't of Agric.*, 739 F. Supp. 2d 185, 196 (E.D.N.Y. 2010) (internal quotation marks omitted).

Courts that have recognized a hostile living environment claim based on gender have similarly required conduct that is either severe or persistent. "Isolated or sporadic sexually inappropriate acts are not sufficiently pervasive and severe to constitute sexual harassment under the FHA." *Rich v. Lubin*, 2004 WL 1124662, at *4 (S.D.N.Y. May 20, 2004); *see also Shellhammer v. Lewallen*, 1985 WL 13505, at *2 (6th Cir. July 31, 1985)

30

("[Plaintiff] points to two [sexual] requests during the three or four months of her tenancy. This does not amount to the pervasive and persistent conduct which is a predicate to finding that the sexual harassment created a burdensome situation[.]"). In order to succeed on a gender-based hostile housing environment claim, a plaintiff "must demonstrate severe and pervasive sexual harassment, not isolated or trivial instances of harassment, and a relationship between the harassment and housing." *People of State of N.Y. by Abrams v. Merlino*, 694 F. Supp. 1101, 1104 (S.D.N.Y. 1988).[11]

In this case, Plaintiff claims that Defendant's harassment of her began almost immediately upon her occupancy of the apartment and continued unabated throughout her approximately two-year tenancy. As Plaintiff alleges discrimination based on her status as a woman of African descent, the court examines the facts in the context of dual-motive discrimination.

Both Plaintiff and Defendant agree that Defendant entered the apartment while Plaintiff was present approximately three times and all other contact between them took place in the parking lot, on the telephone, or through the mail. Although Plaintiff cites Defendant's repeated entries into the apartment while she was not present, evidence of these entries was predominantly presented through Mr. El-Basha who credibly testified that Defendant never entered the apartment without an inspection-related purpose. For those entries which were emergency responses to severe flooding from Plaintiff's apartment, the Lease did not require consent or advance notice for Defendant's entry. *See* Def. Ex. C at 6, ¶ 18 ("The Landlord may only enter the leased premises without consent or notice when the Landlord has [a] reasonable belief that there is imminent danger to any person or to property"). Plaintiff's testimony that the flooding was the

---

[11] *See, e.g.*, *Quigley v. Winter*, 598 F.3d 938, 947 (8th Cir. 2010) (finding hostile living environment where "[plaintiff] testified [defendant] subjected her to unwanted touching on two occasions, made sexually suggestive comments, rubbed his genitals in front of her, placed several middle of the night phone calls to her home, [and] made repeated unannounced visits"); *Alfano v. Costello*, 294 F.3d 365, 380 (2d Cir. 2002) (holding that five incidents "were too few, too separate in time, and too mild, under the standard so far delineated by the case law, to create an abusive working environment.").

result of a leaking pipe under her bathroom sink was uncorroborated despite numerous third-party inspections for leaks and was not credible.

According to Plaintiff, Defendant allegedly violated the FHA through three types of alleged harassment in ascending degrees of severity. The first category of alleged harassment consisted of Defendant's repetitive verbal and written complaints to Plaintiff regarding flooding; excess water usage; the use of a curtain on the bathroom door; unauthorized parking; toys, bikes, and household items left in common areas; unsanitary conditions and storage of food; broken refrigerators and other damaged items in the apartment; an unauthorized tenant; and unauthorized pets. Each of these complaints was corroborated by evidence that established either a legitimate business concern or a violation of the Lease, or both. Plaintiff was generally uncooperative with Defendant's efforts to address these concerns, provided no excuse for them, and made no promise or efforts to redress them herself. In *Frazier*, the Second Circuit recognized that a reasonable factfinder could conclude that this type of incident has "nothing to do with [a protected status]." 27 F.3d at 833 (citing *Soules v. U.S. Dep't of Hous. & Urban Dev.*, 967 F.2d 817, 823 (2d Cir. 1992) (tenant rejected not because of familial status but because of her "negative and combative attitude")); *see also Washington v. Sherwin Real Estate, Inc.*, 694 F.2d 1081, 1090 (7th Cir. 1982) (tenant rejected not because of race but because of his "rude and belligerent behavior in the real estate office"). In light of Mr. El-Basha's testimony that Defendant never made an unannounced entry into the apartment that was not inspection related, the court cannot find that Defendant complained about Plaintiff's non-compliance with the Lease in order to harass Plaintiff based on her protected status.

The second category of alleged harassment, if established, consists of two unpleasant and unwarranted acts by Defendant. On one occasion, Plaintiff claims Defendant entered the apartment without notice or consent while she was partially clothed and told her he could do so because it was his property. On the other occasion, she claims Defendant made a statement in front of her children to the effect that he was not renting the apartment to her so that she could have sex. Each of these events would

be offensive to a reasonable person in Plaintiff's circumstances. Defendant denies that either event occurred. The court cannot fully credit either Plaintiff's or Defendant's version of these events. On balance, even crediting Plaintiff's version of these events, independently and collectively, these incidents are not sufficiently pervasive or severe to constitute a hostile housing environment.

The third category of alleged harassment consists of Plaintiff's testimony that Defendant entered her apartment without notice or consent and intentionally exposed her, not only by removing the curtain covering the bathroom door, but by pulling back the shower curtain to expose her while she was naked in the shower. If established, this incident is arguably sufficiently severe to give rise to a hostile housing environment and an award of compensatory and punitive damages. *See United States v. Space Hunters, Inc.*, 429 F.3d 416, 427 (2d Cir. 2005) ("A plaintiff may establish the requisite state of mind for an award of punitive damages with evidence (1) that the defendant discriminated in the face of a perceived risk that its actions violated federal law, *or* (2) of egregious or outrageous acts that may serve as evidence supporting an inference of the requisite evil motive.") (citations, alterations, and internal quotation marks omitted). The court, however, finds that Plaintiff's testimony with regard to the shower incident not wholly credible for the following reasons.

First, at times during the bench trial, Plaintiff demonstrated either a disregard for the oath or a misunderstanding of the need to provide truthful responses.[12] For example, she gave false testimony regarding the status of her relationship with Mr. El-Basha and his occupancy of the apartment; the downstairs tenants' complaints of water leaking into their apartment and Defendant's request to show her the damage; the payment of rent; the wearing of a headscarf; and the damage to the apartment during her tenancy.

---

[12] The court raised this concern with the attorneys at the bench. *See* Doc. 92 at 28-29 (The court: "So I have a concern that I think would be better handled by you as opposed to me, not being heavy handed about her not understanding the [oath.] . . . But it will be important to communicate that [her testimony is] under oath, and the answers need to be truthful[.]").

Second, Plaintiff's previous descriptions of the shower incident did not characterize Defendant's exposure of her naked body as intentional. For example, in her deposition, Plaintiff testified that Defendant removed the curtain in front of the bathroom door, entered the bathroom while she was showering, and saw her naked. She did not, however, claim that Defendant intentionally pulled back the shower curtain to expose her.[13] Although both versions of the shower incident would be offensive to a reasonable person in Plaintiff's circumstances, a deliberate exposure of Plaintiff's naked body without her consent would be outrageous. The court finds that if this version of the shower incident took place, Plaintiff would have complained about it and avoided further interaction with Defendant because in many respects, Plaintiff demonstrated a commendable ability to express her point of view and lodge a complaint. For example, in response to Defendant's parking complaints, Plaintiff sat in the driveway to 74 Front Street without a headscarf yelling at Defendant and blocking his truck for at least fifteen minutes. She complained to both BHA and the police regarding the broken refrigerator. She repeatedly requested BHA and others to inspect the pipe she claimed was leaking under her bathroom sink. She and her attorney reported a broken doorframe and broken lock on the door to her apartment to the police. There is no evidence that Plaintiff made a similar complaint regarding the shower incident or looked for another apartment.

---

[13] At the bench conference, the court inquired whether Plaintiff's trial version of the shower incident had been disclosed in discovery. Defendant's counsel indicated that it had not. Plaintiff's counsel stated that she had heard this version of the shower incident many times and believed she had disclosed it, however in both Plaintiff's initial Complaint and Amended Complaint, Plaintiff did not allege Defendant intentionally pulled back the shower curtain to expose her:

> On one occasion, defendant entered the apartment without notice when Ms. Mohamed was showering and proceeded to enter the bathroom, where he saw Ms. Mohamed naked. He pulled down a curtain Ms. Mohamed had hung in the bathroom doorway and took it away with him. Defendant's entrance without notice into plaintiffs' home and then entering her bathroom where she was showering and seeing Ms. Mohamed without clothing, scared and shocked Ms. Mohamed both as a woman and as a Muslim.

(Doc. 3 at 5; Doc. 29 at 5.)

34

Instead, when she eventually moved to another apartment, she chose one close to Defendant's personal residence and Mr. El-Basha took the children to Defendant's personal residence on Halloween.

On balance, although the court finds that at times Defendant's behavior toward Plaintiff was offensive, because of issues with Plaintiff's credibility, the court cannot find that she has established by a preponderance of the evidence that Defendant entered the apartment without consent and without justification under the Lease, and deliberately exposed Plaintiff's naked body in the shower by pulling back the shower curtain in the apartment's bathroom. Without this deliberate and highly offensive conduct, viewed collectively, Defendant's remaining conduct was insufficiently severe or persistent to create a hostile housing environment. Even if that element could be satisfied, Plaintiff cannot further establish that she left the apartment within a reasonable period of time after her housing conditions became intolerable.[14]

Although Plaintiff's failure to establish severe or persistent interference with her peaceful enjoyment of the apartment is fatal to her FHA claims, the court proceeds to consider whether other elements of her claims have been established in order to facilitate appellate review.

## C. Whether Plaintiff Has Proven Discriminatory Intent.

A plaintiff may produce either: "(1) direct evidence of discriminatory intent or (2) indirect evidence creating an inference of discriminatory intent under the *McDonnell Douglas* burden-shifting framework." *United States v. Hylton*, 944 F. Supp. 2d 176, 187 (D. Conn. 2013). For both types of intent, "it must be clear that the hostile . . . environment was the result of discrimination based on a protected status." *Kelley v. Billington*, 370 F. Supp. 2d 151, 157 (D.D.C. 2005).

---

[14] In her deposition, Plaintiff testified that S.H.K. was a year old at the time of the shower incident and that this was "the first incident that happened between me and him." *See* Pl. Ex. 4 at 5-9. Plaintiff's initial Complaint was filed on April 27, 2017. The Complaint states that S.H.K. is three years old. Plaintiff remained in the apartment at least until January 5, 2018, when her motion for a TRO was filed. Plaintiff thus remained in the apartment approximately two years after the shower incident took place.

To constitute direct evidence of discriminatory intent, there must be a discriminatory reason provided for the contested decision without "relying on any inference." *Butt v. Bd. of Trs. of E. Ill. Univ.*, 83 F. Supp. 2d 962, 968 (C.D. Ill. 1999). In other words,

> [d]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. Direct evidence does not include stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself.

*Gallagher*, 619 F.3d at 831 (citation and internal quotation marks omitted).

In the instant case, Plaintiff cites two offensive comments by Defendant, neither of which took place in temporal proximity to Defendant's decision not to renew her Lease. The first comment was in response to Plaintiff's methods of storing food and consisted of a suggestion that she would be better off returning to her home country which was described in disparaging terms. The second comment was in response to Mr. El-Basha's occupancy of the apartment and Plaintiff's son changing into his uniform and included a statement to the effect that Defendant was not renting Plaintiff the apartment so that she could have sex. Accepting Plaintiff's version of these events, while both comments are offensive, they are not direct evidence of discriminatory intent because they are unconnected except by inference to nonrenewal of the Lease or Plaintiff's decision to leave the apartment. *Cf. Mojica v. Gannett Co.*, 7 F.3d 552, 561 (7th Cir. 1993) (finding evidence of direct discrimination where plaintiff was told by employer's representative that she would not be hired because she was not "a black male") (internal quotation marks omitted); *Inland Mediation Bd. v. City of Pomona*, 158 F. Supp. 2d 1120, 1132, 1143 (C.D. Cal. 2001) (holding statements by defendant that "he did not rent to Blacks, [and] that Blacks were nothing but trouble" established direct evidence of discrimination); *Texas v. Crest Asset Mgmt., Inc.*, 85 F. Supp. 2d 722, 730 (S.D. Tex. 2000) (finding statements by the defendant that plaintiff was an Arab terrorist and should move out direct evidence of discrimination).

In the absence of direct evidence of discrimination, Plaintiff must rely on "indirect evidence creating an inference of discriminatory intent under the *McDonnell Douglas* burden-shifting framework." *Hylton*, 944 F. Supp. 2d at 187 (citing *Gallagher*, 619 F.3d at 831). When considering "isolated stray remarks" to determine whether they are probative of discriminatory intent, "[t]he more remote and oblique the remarks are in relation to the [decision-maker]'s adverse action, the less they prove that the action was motivated by discrimination[.]" *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (internal quotation marks omitted). Conversely, "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." *Id.* On this point, *Baker v. Waterford Square Homeowners Ass'n*, 2002 WL 1461735 (N.D. Tex. July 2, 2002), is instructive.

In *Baker*, the plaintiff brought a disparate treatment claim under the FHA alleging that the defendant homeowner's association and a member of its board had created a hostile housing environment in several of the dwelling units she owned based on her race, national origin, and/or gender. Between 1994 and 1999, the court found that the defendants had:

> periodically advised [plaintiff] of co-owner and tenant complaints based on the noise and odors caused by the dogs, trash in her unit patios, and noise caused by one of her tenants. It informed her that she was in violation of relevant bylaws and ownership requirements due to a missing divider wall between Units 118 and 119; her practice of keeping stray cats . . . in her units and feeding them in the parking lot area; her failure to maintain her mini-blinds and screen doors in good repair; her failure to remove a barbecue grill and doghouse from her patio; her failure to control the traffic caused by one of her tenants and his guests; her failure to control overcrowding in one of her units; and her failure to remove window signs.

*Id.* at *1.

The defendants requested plaintiff to take corrective action, began assessing her fines under the homeowner's association bylaws, and eventually threatened non-judicial foreclosure based on her failure to pay the fines and assessments. In dismissing the plaintiff's FHA claims, the district court found that the plaintiff "failed to prove that

either defendant created a hostile environment that was based on her race, national origin, or sex" as "[t]he evidence instead shows that [the defendants] received numerous complaints, over a sustained period of time, about the noise and odors caused by [the plaintiff's] dogs, her practice of feeding stray cats, the condition of her property, and the conduct of some of her tenants." *Id.* at *3 (footnote omitted). The court noted that "although the evidence shows . . . some stray remarks that reflect regrettable insensitivity to women and minorities, the court [wa]s persuaded by the evidence as a whole that [the] conduct toward [the plaintiff] was based on [a] profound disagreement with the manner in which she maintained her units and conducted herself[.]" *Id.* (footnote omitted). It therefore concluded that, "[a]t bottom, this [was] a dispute about the exercise of property rights, not unlawful discrimination under federal law." *Id.* A similar conclusion is warranted in the instant case.

Like the defendants in *Baker*, Defendant exhibited a profound and persistent disagreement with the manner in which Plaintiff performed her obligations under the Lease. In writing, he generally presented his concerns in a blunt but courteous manner. In person, he apparently presented his concerns with less tact. The preponderance of the evidence nevertheless establishes that the animus between Defendant and Plaintiff had nothing to do with her protected status. The same decision-maker doctrine underscores this conclusion.

Developed in the context of employment discrimination claims, the same decision-maker doctrine provides that "[w]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).[15] In other words, in the context of a hostile

---

[15] *See, e.g., Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) ("[Plaintiff] was fired by the same man who had hired him three years earlier[.] . . . In the past, we have found this factor highly relevant, stating that some factors strongly suggest that invidious discrimination was unlikely.") (internal quotation marks omitted); *Cordell v. Verizon Commc'ns, Inc.*, 331 F. App'x 56, 58 (2d Cir. 2009) (finding no discrimination where "[plaintiff's] supervisor[] and [the]

38

housing environment claim, it is unlikely that the same decision-maker who agreed to rent to an individual in a protected class would later constructively evict that person based on that same protected status. Application of the same decision-maker doctrine in this case reveals that Defendant rented the apartment to Plaintiff whom he knew to be a woman from Africa who planned to live in the apartment as a single mother of several children. Thereafter, he facilitated Plaintiff's occupancy by permitting her to pay her security deposit in installments. Despite clear violations of the Lease, Defendant did not announce his intention to terminate or not renew the Lease until the expiration of the rental period. Although Plaintiff stopped paying rent and did not immediately vacate the apartment after the Lease expired, Defendant did not evict her. These facts strongly support an absence of discriminatory intent.

In determining discriminatory intent, the court must also consider whether other individuals in the protected class were subject to discrimination. During Plaintiff's tenancy in the apartment, all other tenants of 74 Front Street were persons of color who had emigrated to the United States, including several tenants who were from Africa. This evidence further supports a conclusion that the animus between Defendant and Plaintiff was not because of her gender or country of origin. Where there is an absence of discriminatory intent, courts routinely reject hostile housing environment claims under the FHA.[16]

---

Director of Human Resources, were responsible for both the promotion and termination decisions within a matter of a few weeks") (internal quotation marks omitted).

[16] *See, e.g.*, *Frazier*, 27 F.3d at 833 ("In this case, there was an abundance of evidence before the jury to the effect that Mr. Rominger's conduct had nothing to do with race. The defendants submitted evidence of a past record of renting to minority tenants, including the testimony of an African-American tenant who stated that the Romingers never treated her or her family unfairly on account of race," together with Mrs. Rominger's testimony that "[m]y family is black. I am black myself, if you put it this way" and evidence that the apartment was later rented to a Hispanic female); *Sassower v. Field*, 973 F.2d 75, 77 (2d Cir. 1992) (noting evidence at trial "indicated that the occupants of the apartment building included Jews and single women, a circumstance tending to refute plaintiffs' claim concerning the basis for their rejection"), *cert. denied*, 507 U.S. 1043 (1993); *Payne v. Goodyear Tire & Rubber Co.*, 760 F. App'x 803, 808 (11th Cir. 2019) (noting African-American plaintiff's claim of discrimination was undermined by the fact that "of his eight-person probationary employee class, six of the trainees were

Because Plaintiff fails to establish that Defendant's alleged harassment and nonrenewal of the Lease was motivated by a discriminatory animus towards Plaintiff's national origin or gender, she has not established an essential element of her FHA claims. *See Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982) ("A plaintiff must establish "a causal connection between the protected activity and the adverse [housing] action.").

## D. Whether Defendant Had a Legitimate Business Reason for Non-renewal of the Lease.

Even if Plaintiff could satisfy the prima facie elements of her FHA claims, Defendant introduced ample evidence of legitimate business reasons for his repeated visits to the apartment, his complaints, and his non-renewal of the Lease. Under Vermont law, "[t]he landlord may terminate a tenancy for failure of the tenant to comply with a material term of the rental agreement[.]" 9 V.S.A. § 4467(b)(1); *see Zurmuhlen v. Uchida*, 569 A.2d 480, 482 (Vt. 1989) (noting "a breach [of a lease] is the ground of a forfeiture"). An unauthorized tenant and pets; the serious water damage to Mr. Thapa's apartment; the parking violations; the damage to the apartment's doors, kitchen cabinets, carpeting, bathroom, and refrigerator; and the misuse of common areas were all legitimate business reasons for refusing to renew the Lease. Plaintiff has not shown that Defendant's concerns were pretextual and has not established that the real reason for Defendant's conduct was unlawful discrimination based on her gender and national origin. She has thus failed to sustain her ultimate burden of proof. *See Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005) ("[A] plaintiff must prove that a defendant's proffered reasons were not the true reasons for its actions but a pretext for discrimination.").

African-American and all of them successfully completed the training [in question]" and because he was "eventually replaced by an African-American candidate."); *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 452 (S.D.N.Y. 2013) ("Finally, Christmas Tree Shops replaced Plaintiff with another woman, further weakening her claim of gender discrimination."); *Jean-Gilles v. Cty. of Rockland*, 195 F. Supp. 2d 528, 533 (S.D.N.Y. 2002) (noting "the fact that another minority was made commissioner does tend to weaken plaintiff's [Title VII] claim").

### E. Whether Plaintiff's Children Have Established Discrimination on the Basis of National Origin or Plaintiff's Gender.

Plaintiff's children bring individual claims against Defendant for his alleged discrimination against them on the basis of their national origin and her gender. "[T]he sole requirement for standing to sue under § 812 [of the FHA] is the Art[icle] III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered a distinct and palpable injury[.]" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982) (internal quotation marks omitted). In certain circumstances, a child may recover for injuries based upon discriminatory treatment of his or her parent. *See HUD v. Schmid*, 1999 WL 521524, at \*10 (HUD ALJ 1999) ("Like Justin in the instant case, [the children] felt insulted by the offender's attitude about children and perplexed by the discriminatory statement."). In this case, however, hostile housing environment claims on behalf of Plaintiff's children fail for the same reason as Plaintiff's own claims.

## CONCLUSION

For the foregoing reasons, the court enters judgment in Defendant Michael McLaurin's favor on claims for discrimination on the basis of national origin and gender under the Fair Housing Act asserted by Plaintiffs Binti O. Mohamed, H.M.A., A.O.A., K.H.K., F.H.K., M.H.K., S.H.K., and S.H.K.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this __30th__ day of May, 2019.

Christina Reiss, District Judge
United States District Court